# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-20686

United States Court of Appeals
Fif h Circuit

**FILED**

November 13, 2017

Lyle W. Cayce
Clerk

WILLIAM WINDHAM, Medical Doctor,

   Plaintiff - Appellant

v.

HARRIS COUNTY, TEXAS; DEPUTY T. R. PASKET; DEPUTY M. DUNN; JOHN DOE SUPERVISORS,

   Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas

Before SMITH, OWEN, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Two Harris County sheriff's deputies detained plaintiff William Windham on suspicion of driving while impaired. Windham filed suit against the officers and the County, contending that a standard field sobriety test injured him as a result of his preexisting neck condition. He now appeals the district court's grant of summary judgment for defendants on his failure-to-accommodate claim under Title II of the Americans with Disabilities Act ("ADA"), and on his claims for unjustified detention, excessive use of force, and municipal liability under 42 U.S.C. § 1983 and the Fourth Amendment. We affirm.

No. 16-20686

## BACKGROUND

On May 30, 2011, Deputy Thomas Pasket was called to investigate an accident reportedly caused by an intoxicated driver. When he arrived at the scene around 2:49 p.m., he learned that Windham had rear-ended another car. The other car's passenger reported that Windham appeared to be under the influence of drugs or alcohol and had fallen asleep behind the wheel while waiting for the police. Pasket observed that Windham's eyes were bloodshot, that he appeared confused, and that he had not been aware that he had hit another car. Windham explained that he had taken a prescription painkiller at 3:00 a.m. and had been awake for twenty hours.

Windham suffered from cervical stenosis. As a result, his neck involuntarily assumed a flexed, downward-looking position. He carried an explanatory doctor's note. The note stated that Windham's stenosis "place[d] him at risk for strenuous activities and particularly for driving in the unpredictable event of an accident." It added that "[b]ecause of [Windham's] risk of neurologic injury from neck extension, he should also consider delaying his thyroid surgery until such time as his cervical spine issues have been addressed." And it concluded by asking the reader to "[k]indly afford [Windham] the opportunity to address these issues in whatever way that you can help him." The note gave no further details, however, as to the nature of Windham's "issues" or the accommodations they required.  Pasket read the note and assured Windham that "nobody w[ould] extend [his] neck."[1]

---

[1] The doctor's note read in full:

> To Whom It May Concern:
>
> Dr. Windham is a patient of mine who suffers from severe stenosis of the cervical spine from disc disease at the C4/5 level.

2

No. 16-20686

Pasket then sought Windham's permission to administer certain standard field sobriety tests. Although Windham declined to perform some, he "promptly agreed" to a gaze nystagmus test.[2] That test involves waiving a stimulus in front of the subject's face and tracking his eye movements. Pasket performed the test without injuring Windham. The results were negative or inconclusive. Pasket determined that he needed to call a certified drug recognition expert, Deputy Matthew Dunn, to gauge Windham's impairment.[3]

Dunn responded to Pasket's call as quickly as he could, arriving at 4:01 p.m. He spoke first with Pasket for about ten minutes. The officers then approached Windham together. The dash cam on Dunn's patrol car recorded their interaction. To the extent the parties' recollections differ from the video account, we credit the video. *See Scott v. Harris,* 550 U.S. 372, 380–81 (2007).

According to the video, Windham began by telling Dunn that he

---

> Dr. Windham's symptoms place him at risk for strenuous activities and particularly for driving in the unpredictable event of an accident. Dr. Windham is in the process of seeking surgical remedy for this problem, but that may take some time to unfold. Because of the patient's risk of neurologic injury from neck extension, he should also consider delaying his thyroid surgery until such time as his cervical spine issues have been addressed.
>
> Hopefully Dr. Windham's symptoms will be improving in a relatively short time frame. Kindly afford him the opportunity to address these issues in whatever way that you can help him.
>
> Sincerely,
> Mark D. Barhorst, M.D.

[2] The parties' accounts differ as to when Windham was subjected to a horizontal gaze nystagmus test and when he was subjected to a vertical one. Because this distinction is immaterial, we refer only to general "gaze nystagmus tests."

[3] Although Windham's declaration arguably puts these events in a different sequence, we credit the order of events he provides in his appellant brief. *See United States v. Monkey,* 725 F.2d 1007, 1010 (5th Cir. 1984); 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2723 (4th ed. updated Apr. 2017) ("[A]dmissions in the brief of the party opposing the motion [for summary judgment] may be used in determining that there is no genuine dispute as to any material fact."). The distinction is in any event immaterial.

No. 16-20686

"do[es]n't drive at all" because he has "cervical stenosis with radiculopathy in both [his] legs." He added, "It's right here on my surgical..." before trailing off and handing Dunn a stack of papers, including the doctor's note. Dunn held the papers at arm's length and glanced at the topmost page for about three seconds. No one mentioned the note.

Dunn asked Windham if he would perform some field sobriety tests. Windham responded, "Yeah I'm not gonna be able to do them." Dunn asked, "So are you refusing to do any?," and Windham quickly assured him, "No." Dunn sought clarification: "So you said you will or you won't?" Windham replied, somewhat enigmatically, "No I will. But I'm not gonna be able to." Dunn remarked "okay" and began administering a gaze nystagmus test.

When Dunn instructed Windham to "look up at me" and "put your head up," Windham promptly did so, but added: "It hurts to lift my head up this high." Dunn asked if he had any head injuries and Windham answered, "No, but the neck hurts." Windham never indicated that he could not complete the test or asked Dunn to stop. He also never asked Dunn to administer the test differently or to use another test instead. To the contrary, he completed the gaze nystagmus test without further complaint. He held his head in the requested position for about forty-five seconds. He then completed the walk-and-turn test and the one-leg-stand.

Dunn concluded that Windham was insufficiently impaired to justify arrest and released him around 4:18 p.m. The entire encounter lasted approximately ninety minutes. The district court determined, and no one now disputes, that a reasonable jury could find that Windham suffered injury as a result of Dunn's administration of the gaze nystagmus test. Windham sued Pasket, Dunn, and the County, all of whom secured summary judgment on the relevant claims. *See Windham v. Harris Cty.*, No. 4:13-cv-1576, 2016 WL 4939563 (S.D. Tex. Sept. 13, 2016). Windham timely appealed.

No. 16-20686

## STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo, applying the same standards as the district court. *Robinson v. Orient Marine Co.*, 505 F.3d 364, 365 (5th Cir. 2007). Summary judgment is proper only if the movant shows both that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Although we view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *SEC v. Kahlon*, 873 F.3d 500, 504 (5th Cir. 2017), summary judgment remains appropriate if the evidence is "merely colorable" or "not significantly probative," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We may affirm a grant of summary judgment on any ground the record supports. *United States ex rel. King v. Solvay Pharm., Inc.*, 871 F.3d 318, 323 (5th Cir. 2017).

## ANALYSIS

### I.     Title II of the ADA

Title II of the ADA provides: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. It further defines "public entities" to include local governments. § 12131(1)(A). And it creates a private right of action against them for monetary and equitable relief. *See* § 12133. These provisions allow individuals to sue local governments for disability discrimination committed by police in non-exigent circumstances. *See Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 570–71, 574–76 (5th Cir. 2002); *Hainze v. Richards*, 207 F.3d 795, 802 (5th Cir. 2000).[4]

---

[4] Harris County has not sought to avail itself of the exigent-circumstances exception to Title II we created in *Hainze*. Nor would that exception apply on these non-exigent facts.

5

No. 16-20686

To make out a prima facie case under Title II, a plaintiff must show "(1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability." *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 671–72 (5th Cir. 2004). The County does not dispute that a reasonable jury could find for Windham on the first two prongs. Our analysis concerns only whether a reasonable jury could find that the County discriminated against Windham "by reason of his disability."[5]

Windham attempts to satisfy the third prong on a theory of "failure to accommodate." That theory is expressly codified in Title I of the ADA (governing employment), which defines "discriminat[ion] . . . on the basis of disability" to include "not making reasonable accommodations [for a disabled employee's] known physical or mental limitations." 42 U.S.C. § 12112(b)(5)(A). Although Title II contains no similarly explicit definition, *see* 42 U.S.C. §§ 12131, 12132, our cases recognize that a public entity's failure reasonably to accommodate the known limitations of persons with disabilities can also constitute disability discrimination under Title II. *See Bennett-Nelson v. La. Bd. of Regents*, 431

---

[5] To recover compensatory damages for disability discrimination under Title II of the ADA, a plaintiff must also show that the discrimination was "intentional" in the sense that it was more than disparate impact. *Delano-Pyle*, 302 F.3d at 574 (citing *Carter v. Orleans Par. Pub. Sch.*, 725 F.2d 261, 264 (5th Cir. 1984)). This requirement exists because Title II incorporates the remedies in Title VI of the Civil Rights Act of 1964, *see* 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2), and because "private individuals c[annot] recover compensatory damages under Title VI except for intentional discrimination," *Alexander v. Sandoval*, 532 U.S. 275, 282–83 (2001). Here, the district court appears to have relied on the intentionality requirement to resolve Windham's failure-to-accommodate claim. *See Windham*, 2016 WL 4939563, at *7. The parties dispute whether that was proper. But because we conclude below that Windham has not established that the attending officers knew of Windham's limitation and necessary accommodation, such that Windham fails to establish a prima facie case in any event, we need not reach the issue.

F.3d 448, 454 & n.11 (5th Cir. 2005) ("[Title II] impose[s] upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." (citing 42 U.S.C. § 12131)); *see also Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 633 F. App'x 214, 215 (5th Cir. 2015) (adapting the failure-to-accommodate standard from Title I to Title II); *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015) (same).[6] We have also recognized Title II claims in the specific context of police officers who fail reasonably to accommodate the known limitations of disabled persons they detain.[7]

A critical component of a Title II claim for failure to accommodate, however, is proof that "the disability and its consequential limitations were known by the [entity providing public services]." *Jin Choi*, 633 F. App'x at 215 (quoting *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 247 (5th Cir. 2013)); *accord Ball*,

---

[6] Other circuits share this view. *See, e.g.*, *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1195 n.8 (10th Cir. 2007) ("Title II's use of the term 'reasonable modifications' [in 42 U.S.C. § 12131] is essentially equivalent to Title I's use of the term 'reasonable accommodation.'"); *McGary v. City of Portland*, 386 F.3d 1259, 1266 n.3 (9th Cir. 2004) ("Although Title II of the ADA uses the term 'reasonable modification,' rather than 'reasonable accommodation,' these terms create identical standards."); *Henrietta D. v. Bloomberg*, 331 F.3d 261, 273 n.7 (2d Cir. 2003) ("'[D]iscrimination,' which is not defined in Title II, may take its meaning from Title I.'" (citation omitted)); *Washington v. Ind. High Sch. Athletic Ass'n*, 181 F.3d 840, 848 (7th Cir. 1999) ("Congress clearly intended the failure-to-accommodate method of proving discrimination to apply to Title II.").

[7] *See Delano-Pyle*, 302 F.3d at 570–71, 575–76 (affirming jury verdict that police officers discriminated against deaf arrestee by failing to accommodate the limitations arising from his inability to hear); *Hainze*, 207 F.3d at 802 ("Once the area was secure and there was no threat to human safety, the Williamson County Sheriff's deputies would have been under a duty to reasonably accommodate Hainze's disability . . . ."); *see also Waller ex rel. Estate of Hunt v. City of Danville*, 556 F.3d 171, 174 (4th Cir. 2009) ("In the context of arrests, courts have recognized two types of Title II claims: (1) wrongful arrest, where police arrest a suspect based on his disability, not for any criminal activity; and (2) reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees.").

792 F.3d at 596 n.9.[8] Mere knowledge of the disability is not enough; the service provider must also have understood "the limitations [the plaintiff] experienced . . . *as a result* of that disability." *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 164 (5th Cir. 1996) (emphasis added); *accord Patton v. Jacobs Eng'g Grp., Inc.*, --- F.3d ---, ---, 2017 WL 4784586, at *5 (5th Cir. Oct. 24, 2017); *Jin Choi*, 633 F. App'x at 216.[9] Otherwise, it would be impossible for the provider to ascertain whether an accommodation is needed at all, much less identify an accommodation that would be reasonable under the circumstances.[10] *Taylor*, 93 F.3d at 164. Thus, because "[t]he ADA does not require clairvoyance," *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995), the burden falls on the plaintiff "to specifically identify the disability and resulting limitations," *Taylor*, 93 F.3d at 165, and to request an accommodation in "direct and specific" terms, *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir. 2001).[11]

---

[8] We have recently described a failure-to-accommodate claim under Title II as requiring the plaintiff to prove: "(1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the [public] entity; and (3) the entity failed to make reasonable accommodations." *Ball*, 792 F.3d at 596 n.9; *accord Jin Choi*, 633 F. App'x at 215. Proof of these elements suffices to establish a prima facie case as defined in *Melton*, 391 F.3d at 671–72.

[9] Although we developed these principles in cases applying Title I, *e.g.*, *Taylor*, 93 F.3d at 163–65, the rules are "no less applicable in the context of Title II," *Robertson*, 500 F.3d at 1196; *see id.* at 1195–98; *Jin Choi*, 633 F. App'x at 215–16; *Ball*, 792 F.3d at 596 n.9.

[10] As we have explained, "the ADA requires [public entities] to reasonably accommodate limitations, not disabilities." *Taylor*, 93 F.3d at 164. To borrow *Taylor*'s example: A hearing-impaired worker may require significant accommodations while working as a telephone operator, but have no difficulty working in an assembly line, despite the same disability. 93 F.3d at 164. Similarly, a police detainee with a broken leg may suffer unnecessary pain if required to perform the one-leg-stand sobriety test, but face no limitations in tracking a pen with his eyes. In Title II cases, "the critical component of the entity's knowledge is that it is aware not just that the individual is disabled, but that the individual's disability affects his ability to receive the benefits of the entity's services," *Robertson*, 500 F.3d at 1197 n.10, or— in the context of police detentions, "caus[es] him to suffer greater injury or indignity than other [detainees]," *Waller*, 556 F.3d at 174.

[11] Of course, a plaintiff need not request, or even know, the particular reasonable accommodation he ultimately requires. That judgment "is best determined through a flexible, interactive process" involving both the plaintiff and the public entity. *Taylor*, 93 F.3d at 165.

No. 16-20686

When a plaintiff fails to request an accommodation in this manner, he can prevail only by showing that "the disability, resulting limitation, and necessary reasonable accommodation" were "open, obvious, and apparent" to the entity's relevant agents. *Taylor*, 93 F.3d at 164; *accord Jin Choi*, 633 F. App'x at 216 (applying standard to Title II); *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185,1197 (10th Cir. 2007) (collecting cases across circuits); *see, e.g., id.* at 1198 (reasonable jury could infer that deaf arrestee's inability meaningfully to participate in his probable-cause hearing was sufficiently obvious to put officers on notice of the need for a hearing aid). The parties dispute what type of knowledge is required (although neither provides any citation or analysis): the County couches its arguments in terms of what "would have alerted a reasonable officer," whereas Windham asserts that the inquiry is subjective. Although our caselaw speaks generally in terms of the entity's subjective knowledge,[12] we do not appear to have confronted this question directly. Nor must we do so now. As explained below, we would reach the same conclusion on either party's view of the law.

In this case, Windham contends that the County failed reasonably to accommodate his neck disability in Dunn's administration of the gaze nystagmus test. That test required Windham to raise his head into a neutral, forward-looking position for about forty-five seconds. The County does not challenge the district court's conclusion that a reasonable jury could find that, because of Windham's disability, doing so caused him injury.

---

A police detainee with a broken leg, for example, may not know enough about police investigatory procedures to specifically request a gaze nystagmus test; it is enough for him to ask generally for an alternative to the one-leg stand.

[12] *E.g., Patton*, 2017 WL 4784586, at *4 (affirming grant of summary judgment because "there is insufficient evidence to prove [the relevant agents'] knowledge of [the plaintiff's] disability"); *Taylor*, 93 F.3d at 163–64 (affirming grant of summary judgment because the plaintiff failed to adduce "evidence which would allow a reasonable trier of fact to find that [the entity] knew of [the plaintiff's] limitations").

But Windham never asked the officers for any accommodation. Far from requesting, for example, that the gaze nystagmus test not be performed or that it be administered from a lower angle, Windham made no requests of the officers whatsoever. He also expressly confirmed that he was not refusing to perform the test. Although Windham did express vague skepticism about whether he would "be able to do" the tests, that statement can hardly be construed as a "request" for anything. It does not constitute the kind of clear and definite request for accommodations that would trigger the duty to accommodate under the ADA. *See Taylor*, 93 F.3d at 165.

Nor has Windham adduced evidence from which a reasonable jury could infer that the extent of Windham's limitation and the necessary accommodation were "obvious"—that is, infer that Pasket and Dunn knew or should have known that Windham's neck condition was such that looking straight ahead would injure him, and that Pasket and Dunn knew or should have known what accommodation Windham needed. *See Taylor*, 93 F.3d at 164–65. To be sure, a jury could find that the officers knew or should have known Windham suffered from a neck-related disability. But knowledge of a disability is different from knowledge of the resulting limitation. And it certainly is different from knowledge of the necessary accommodation. *See Patton*, 2017 WL 4784586, at *5; *Jin Choi*, 633 F. App'x at 216; *Taylor*, 93 F.3d at 164. To prevail, Windham must adduce evidence that all three were or should have been obvious. *Taylor*, 93 F.3d at 165. He fails to make that showing.

As an initial matter, Windham has never argued that his disability, limitation, and necessary accommodation are of a kind that would still have been "open, obvious, and apparent" even if Windham had never attempted to explain them. That may be true of well-understood and outwardly visible disabilities like, say, blindness, deafness, or being wheelchair-bound. *Cf., e.g., Robertson*,

500 F.3d at 1198 (need for hearing aid could be found obvious). But no one suggests that cervical stenosis fits that category.

Windham instead attempts to prove the requisite "obviousness" by relying on his doctor's note. But that note could not reasonably be found to have apprised the officers of Windham's limitation or how that limitation should be accommodated. The closest the note came was its statement, buried in a dependent clause in the second paragraph, that Windham "risk[ed] . . . neurologic injury from neck extension." Yet nothing in the note defined "neck extension" or intimated that Windham risked injury by moving his head into a neutral, forward-looking position (an act that does not obviously constitute "neck extension" on its own). The note therefore could not have rendered Windham's limitation "obvious"—and it certainly could not have made obvious the necessary accommodation. *See Taylor*, 93 F.3d at 165 n.10 (doctors' affidavits insufficient because they failed to identify "(1) the specific disability; (2) any limitations resulting therefrom, or (3) any reasonable accommodations required").

In his reply brief, Windham additionally points to the statements he made to Dunn during the second gaze nystagmus test. Although Windham expressed generic doubts about his ability to perform the test, and although he said that raising his head caused him pain, none of these statements made clear that Windham needed accommodation for his neck and suggested possible accommodations. Vague statements like these cannot transform Windham's somewhat-obscure condition into one for which the limitations and necessary accommodation were "open, obvious, and apparent." *See Taylor*, 93 F.3d at 164–65.[13]

---

[13] Our own review of the record revealed a more explicit statement of Windham's limitation: According to Windham's declaration, he told Pasket at the outset that—in Windham's words—"neck extension would risk neurologic injury" and "movement of [his] head from a downward looking position to a neutral position was in fact extending [his] neck."

No. 16-20686

Our decision in *Delano-Pyle* does not counsel otherwise. Although we upheld a jury finding of disability discrimination where police officers failed to accommodate a deaf arrestee even without an explicit request for accommodation, 302 F.3d at 575–76, that holding says little about whether Windham's need for accommodation was similarly obvious. For one, the officers in *Delano-Pyle* testified that they understood that the plaintiff's disability prevented him from hearing, yet they continued to give him oral instructions regardless. *Id.* Windham points to no similar evidence here. And, more importantly, the *Delano-Pyle* plaintiff's disability was far more readily apparent. That deafness limits a person's ability to understand oral commands is plain; that cervical stenosis limits a person's ability to look straight ahead for a period of forty-five seconds is not.[14]

As a result, Windham cannot avail himself of the narrow exception applicable only to people whose disabilities, limitations, and necessary accommodations are "open, obvious, and apparent." *Taylor*, 93 F.3d at 165. He instead falls within the generally applicable rule that "[i]f the [plaintiff] fails to request an accommodation, the [public entity] cannot be held liable for failing to provide one." *Id.* Because the record contains no evidence that Windham requested an accommodation, we affirm the district court's grant of summary judgment for the County on the ADA claim.

---

But Windham never relied on or even mentioned this statement in his briefs (either here or in district court). We will not consider it now. *See Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 (5th Cir. 2004) ("Failure adequately to brief an issue on appeal constitutes waiver of that argument."); *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 (5th Cir. 1992) ("Although on summary judgment the record is reviewed de novo, this court, for obvious reasons, will not consider evidence or arguments that were not presented to the district court for its consideration in ruling on the motion."); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

[14] The other case on which Windham relies, *Perez v. Doctors Hospital at Renaissance, Ltd.*, 624 F. App'x 180 (5th Cir. 2015), is even less apposite. Unlike Windham, the *Perez* plaintiff repeatedly requested an accommodation for his disability, obviating the need for the court to determine whether the disability was obvious. *Id.* at 185–86.

No. 16-20686

## II.     Fourth Amendment and § 1983

The Fourth Amendment prohibits "unreasonable . . . seizures." U.S. Const. amend. IV. A seizure is generally reasonable only if justified by an "individualized suspicion of wrongdoing," *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000), and only if carried out in a reasonable manner, *Graham v. Connor*, 490 U.S. 386, 395 (1989). Officers who conduct unreasonable seizures in violation of clearly established law may be liable under 42 U.S.C. § 1983. And local governments may be liable if their policies or customs caused the violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978).

Windham appeals the grant of summary judgment on his claims against the officers for unjustified detention and excessive use of force, and on his claim against the County for failure to train its officers to perform sobriety tests on individuals with neck injuries. We affirm as to each.

### A.     Unjustified Detention

To be justified under the Fourth Amendment, an investigative stop needs only reasonable suspicion. *United States v. Massi*, 761 F.3d 512, 520 (5th Cir. 2014). An arrest, on the other hand, demands the greater showing of probable cause. *Id.* Here, Windham argues that the officers lacked reasonable suspicion, and that, in any event, the detention was functionally an arrest such that probable cause was required.

#### (i)     *Reasonable Suspicion*

The first question is whether the officers "ha[d] a reasonable suspicion . . . that criminal activity 'may [have been] afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). This inquiry "look[s] at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). "Although an

No. 16-20686

officer's reliance on a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id.* (citations omitted). The only relevant information is the information that was available to the officers at the time. *Carroll v. Ellington*, 800 F.3d 154, 171 (5th Cir. 2015).

Pasket had reasonable suspicion to detain and investigate Windham for the crime of driving while impaired. *See* Tex. Penal Code § 49.04. From the seizure's outset, Pasket was aware that (1) Windham had rear-ended the car in front of him; (2) the other driver's passenger had informed both the 911 operator and Pasket that he believed Windham to be intoxicated; (3) the passenger had further reported that Windham fell asleep behind the wheel while waiting for the police; (4) Windham was taking prescription-strength painkillers; (5) Windham had not slept for twenty hours; (6) Windham's eyes appeared bloodshot; and (7) Windham appeared confused and did not know that he had struck a car. These undisputed facts, taken together, surpass the low threshold for reasonable suspicion. *See, e.g.*, *Schmerber v. California*, 384 U.S. 757, 769 (1966) (driver's involvement in an accident and bloodshot eyes contributed to proper finding of probable cause to arrest for driving under the influence).

Windham's arguments do not persuade us otherwise. Although he contends that the witness was mistaken and that Windham in fact was neither sleeping nor impaired, this argument says nothing about whether Pasket *reasonably believed* the witness. Similarly, although Windham's brief asserts that "Windham's eyes were not bloodshot," it cites no record evidence to support that claim. *See* Fed. R. Civ. P. 56(c)(1) (requiring parties to support factual assertions with record citations). Finally, Windham has not argued that reasonable suspicion dissipated as the detention progressed. The district court

14

No. 16-20686

correctly determined that the undisputed facts established reasonable suspicion.

### (ii)     *De Facto Arrest*

The second question is whether the seizure exceeded the bounds of a traffic stop and became a de facto arrest. *See United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993) ("A prolonged investigative detention may be tantamount to a *de facto* arrest, a more intrusive custodial state which must be based upon probable cause rather than mere reasonable suspicion."). "A seizure rises to the level of an arrest only if 'a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest.'" *Carroll*, 800 F.3d at 170 (quoting *United States v. Corral-Franco*, 848 F.2d 536, 540 (5th Cir. 1988)). Windham makes two arguments on this front, both of which we reject.

First, Windham asserts without citation that the traffic stop became an arrest because Pasket "confiscated . . . Windham's driver's license, making it impossible for [him] to drive away." To be sure, taking a detainee's driver's license suggests that some type of seizure has taken place.[15] But examining a detainee's driver's license is an "ordinary . . . incident to [a] traffic stop." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (alteration omitted)

---

[15] *See, e.g.*, *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999) ("[W]hat began as a consensual encounter quickly became an investigative detention once the agents received [defendant's] driver's license and did not return it to him." (quoting *United States v. Lambert*, 46 F.3d 1064, 1068 (10th Cir. 1995))), *modified on denial of reh'g*, 203 F.3d 883 (2000). We note that, in this case, Pasket inadvertently failed to return the driver's license to Windham after Windham was free to go. Pasket returned the license to Windham's residence later that evening. Windham does not argue that this oversight is relevant to the unjustified detention claim.

15

(quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). It does not indicate arrest. *See, e.g.*, *Shabazz*, 993 F.2d at 437 ("[W]e have no doubt[] that in a valid traffic stop, an officer can request a driver's license . . . .").

Second, Windham argues that the length of the traffic stop—close to ninety minutes—transformed it into an arrest. But "[t]here is . . . no constitutional stopwatch on traffic stops." *United States v. Brigham*, 382 F.3d 500, 511 (5th Cir. 2004) (en banc). Instead, "[i]n assessing whether a detention is too long in duration to be justified as an investigative stop, we . . . examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 685–86 (1985). The key requirement is that the stop "last no longer than is necessary to effectuate [its] purpose." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion).

It is undisputed that Pasket determined that he needed the opinion of Dunn, a certified drug recognition expert, to assess the extent of Windham's impairment. It is likewise undisputed that Dunn arrived as quickly as he could, that he administered the tests expeditiously once he arrived, and that those tests were germane to the reasonable suspicion that justified the stop. The parties dispute only whether Pasket's belief was reasonable. According to Windham, because Pasket knew how to perform sobriety tests himself, "[i]t was not necessary to call another officer to obtain a second opinion."

But Windham offers no evidentiary basis for finding Pasket's determination unreasonable. His brief justifies his assertion with just a single piece of evidence: Windham's own declaration that "[a]ny well trained officer should be

able to administer the sobriety test."[16] Suffice it to say, Windham's bare, lay opinion as to the scope of a reasonable police officer's abilities does not create a genuine factual dispute. *See* Fed. R. Civ. P. 56(c)(4) (declarations used to oppose summary judgment motions "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated"); *see also* Fed. R. Evid. 701 (lay opinion testimony must be "rationally based on the witness's perception" and "not based on . . . specialized knowledge"). Windham has not laid adequate foundation for this opinion, nor do we see how he conceivably could do so. His argument is therefore unavailing. We affirm the grant of summary on Windham's unjustified detention claim.

B.    Excessive Force

That the seizure was justified by reasonable suspicion, however, does not end our inquiry. The seizure must also have been conducted in a reasonable manner, without the use of excessive force. *Graham*, 490 U.S. at 395. To prevail on an excessive force claim, a plaintiff must show "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Hamilton v. Kindred*, 845 F.3d 659, 662 (5th Cir. 2017) (internal quotation mark omitted).

The district court erred in holding that Windham's preexisting neck condition prevented him from satisfying the second prong's causation requirement. *See Windham*, 2016 WL 4939563, at *5 (citing *Wells v. Bonner*, 45 F.3d

---

[16] Windham also failed to support this factual assertion in his summary judgment brief in district court. Although that brief lacked discernable organization, as far as we can tell, it contained only one relevant citation. That citation referred to Pasket's deposition testimony describing the inconclusive results of his initial testing. That evidence does nothing to establish that Pasket's decision to seek further testing from a certified expert officer was, in fact, unreasonable.

90, 96 (5th Cir. 1995)). Our law is clear that the second prong does not "preclude[] recovery for aggravation of preexisting injury caused by the use of excessive force." *Dunn v. Denk*, 79 F.3d 401, 403 (5th Cir. 1996) (en banc); *see also Darden v. City of Fort Worth*, 866 F.3d 698, 703 (5th Cir. 2017) (explaining that the second prong does not preclude recovery where a preexisting condition contributed to, but would not have independently caused, the injury). To the extent *Wells v. Bonner* might be read to say otherwise, our en banc court has rejected that understanding. *See Dunn*, 79 F.3d at 403.[17]

We nonetheless affirm on the basis of prong three. Whether a use of force is reasonable "must be judged from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396. It follows that "[w]hat would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which w[ould have been] unknown to [a reasonable] officer at the time." *Rodriguez v. Farrell*, 280 F.3d 1341, 1353 (11th Cir. 2002); *accord Huntley v. City of Owasso*, 497 F. App'x 826, 831 (10th Cir. 2012).[18] Here, there is no doubt that, but for Windham's neck condition, Dunn's administration of the gaze nystagmus test would have been a perfectly reasonable exercise of police authority. And we

---

[17] The district court also went too far in stating, as a categorical matter, that "an excessive force claim cannot survive when the police did not touch the plaintiff." *Windham*, 2016 WL 4939563, at *5 n.3. We have not so held. Other circuits, moreover, "have recognized excessive force claims where the force is expressed by means other than physical contact," *Martin v. Bd. of Cty. Comm'rs*, 909 F.2d 402, 406 (10th Cir. 1990) (collecting cases), including in circumstances resembling those of the case at bar, *id.* at 403–04, 407 (police use of threats of arrest to force wheelchair-bound detainee to walk, causing her injury, constituted excessive use of force). *See also, e.g.*, *Davis v. Bergeon*, 187 F.3d 635, 1999 WL 591448, at *5 (6th Cir. 1999) (unpublished) ("We also do not believe that proof of physical contact is an essential element of an excessive force claim.").

[18] This holding is consistent with *Dunn*. The fact that a use of force aggravates a preexisting injury does not preclude a finding that the injury "resulted directly and only from the use of force." 79 F.3d at 403. But an *unknown* preexisting injury cannot transform what would otherwise be a reasonable use of force into an unreasonable one. *Rodriguez*, 280 F.3d at 1353.

No. 16-20686

have already concluded that, based on the evidence Windham cites, no reasonable jury could find that the officers should have been on notice that his neck condition was such that he would suffer injury if Dunn administered the test. This conclusion is fatal to Windham's excessive force claim, warranting the grant of summary judgment.[19]

C.    *Monell* Liability

Finally, in light of the above, there can be no liability for the County under *Monell*. "We have stated time and again that '[w]ithout an underlying constitutional violation, an essential element of municipal liability is missing.'" *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 866–67 (5th Cir. 2012) (en banc) (alteration in original) (quoting *Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir.1997)). Because Windham fails to demonstrate the existence of a constitutional violation, the County is entitled to judgment on his *Monell* claim as a matter of law.

*    *    *

The district court's judgment is AFFIRMED.

---

[19] Our conclusion also disposes of Windham's late-raised bystander liability claim against Pasket. *See Kitchen v. Dallas Cty.*, 759 F.3d 468, 481 (5th Cir. 2014) ("[B]ystander liability arises . . . only where the plaintiff can allege and prove 'another officer's use of excessive force.'" (quoting *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995))), *abrogated on other grounds*, *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2472–73 (2015).