# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-30879

United States Court of Appeals
Fifth Circuit

**FILED**

December 27, 2018

Lyle W. Cayce
Clerk

JASON HACKER,

      Plaintiff - Appellant

v.

N. BURL CAIN, Warden, Louisiana State Penitentiary at Angola, in His Official and Individual Capacities; LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS; LOUISIANA STATE PENITENTIARY AT ANGOLA; JAMES M. LEBLANC, SECRETARY, DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONS, in His Official and Individual Capacities,

      Defendants - Appellees

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:14-CV-63

Before STEWART, Chief Judge, KING and OWEN, Circuit Judges.

PER CURIAM:*

    Plaintiff Jason Hacker, an inmate in the Louisiana State Penitentiary, sued the prison and various officials for failure to accommodate his disability. A jury determined that Hacker did not suffer a disability as defined by the

---

    * Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-30879

Americans with Disabilities Act, and the district court denied Hacker's post-trial motions. Hacker appeals. For the following reasons, we AFFIRM.

## I.

Jason Hacker is incarcerated in the Louisiana State Penitentiary, commonly known as Angola. On October 17, 2011, Hacker went to Angola's eye clinic complaining of blurred vision, sudden weight loss, and increased hunger. After the visit, his symptoms did not improve, and he continued to complain of "blurry vision." Hacker was prescribed and received eyeglasses but still had trouble seeing.

On June 24, 2012, a doctor at Pennington Biomedical Research Center at Louisiana State University ("LSU") diagnosed Hacker with cataracts and recommended that he receive cataract-removal surgery. Later that year, LSU ophthalmologists performed a corneal topography to determine the quality of Hacker's vision. The results of this test are not clear from the record.

Hacker did not receive cataract removal surgery until 2014. Between his initial diagnosis and the surgery, Hacker contends that his vision continued to decline. In addition to his generalized complaints that his vision was blurry, in May 2013, Hacker began to complain that his cataracts were causing him trouble seeing far away and that he had severe pain in his eyes when exposed to sunlight. On several occasions, medical records indicate that Hacker was "legally blind." At one point, his vision was recorded as being as bad as 20/400 in his left eye, and he was unable to read the eye chart with his right eye. But in March 2014, just four months before his cataract surgery, Hacker's vision was 20/60 in his right eye and 20/100 in the left—although his medical records note that he "look[ed] 'over his cataract' [in his] right eye in order to see [the] eye chart."

Hacker argues that despite his inability to see, the prison did not accommodate his disability. In fact, Hacker was moved from working in the tag

plant to work in Angola's fields in the spring of 2013—work he contends is too dangerous to be performed by someone with limited vision. On one occasion, Hacker made an emergency request for health care while working in the fields because of his vision problems. Hacker testified that, while working in the fields, he tore his pectoral muscle off his bone because he could not see a heavy bale of hay that was being tossed toward him. Hacker and his fellow inmates also testified that his poor eyesight impaired his ability to see, write, work, and play music.

After filing an unsuccessful request through Angola's administrative remedy procedure, Hacker filed suit in federal court. His amended complaint asserted claims under the Eighth Amendment, Americans with Disabilities Act ("ADA"), and Rehabilitation Act. Prior to trial, the district court entered several orders in limine. As is relevant here, the district court denied Hacker's motion to exclude evidence regarding his disciplinary record as moot based on defendants' representation to the court that they would not introduce such evidence. The district court ordered that defendants could not "offer evidence or refer to the specific crimes for which [Hacker] was convicted or the conduct which led to his conviction." Finally, the district court also prohibited evidence of medical treatment unrelated to Hacker's cataracts, "except as it may bear on the issues related to [Hacker's] cataracts."

The jury returned a verdict for the defense, finding that Hacker was not disabled under the ADA and defendants did not act with deliberate indifference to Hacker's medical needs in violation of the Eighth Amendment. Having properly moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) at the close of defendants' case, Hacker renewed his motion under Rule 50(b), or, in the alternative, moved for a new trial under Rule 59. The court denied the motions, finding that reasonable jurors could

No. 17-30879

have found for defendants on all issues and a new trial was not necessary. Hacker's appeal is limited to his claim under the ADA.

## II.

"We review *de novo* the district court's denial of a motion for judgment as a matter of law, applying the same standard as the district court." *Travelers Cas. & Sur. Co. of Am. v. Ernst & Young LLP*, 542 F.3d 475, 481 (5th Cir. 2008). A court may grant a motion for judgment as a matter of law if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on [an] issue." Fed. R. Civ. P. 50(a)(1). "When reviewing the denial of a motion for judgment as a matter of law, we will uphold a jury verdict unless the facts and inferences point so strongly and so overwhelmingly in favor of one party that reasonable men could not arrive at any verdict to the contrary." *Cousin v. Trans Union Corp.*, 246 F.3d 359, 366 (5th Cir. 2001); *see also Foradori v. Harris*, 523 F.3d 477, 485 n.8 (5th Cir. 2008) (noting that same standard applies to review of renewed motion under Rule 50(b)). "In resolving such challenges, we draw all reasonable inferences and resolve all credibility determinations in the light most favorable to the nonmoving party." *Foradori*, 523 F.3d at 485. But "[e]ven though we might have reached a different conclusion if we had been the trier of fact, we are not free to re-weigh the evidence or to re-evaluate credibility of witnesses." *Id.* (quoting *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 297 (5th Cir. 2005)).

Our review of a motion for a new trial is more deferential, and we will only reverse the trial court's denial of a motion for a new trial "when there is a clear showing of an abuse of discretion." *Id.* at 497. "Where a jury verdict is at issue, 'there is no . . . abuse of discretion unless there is a complete absence of evidence to support the verdict.'" *Benson v. Tyson Foods, Inc.*, 889 F.3d 233, 234 (5th Cir. 2018) (per curiam) (omission in original) (quoting *Sam's Style Shop v. Cosmos Broad. Corp.*, 694 F.2d 998, 1006 (5th Cir. 1982)). Courts

No. 17-30879

"should not grant a new trial on evidentiary grounds unless the verdict is against the great weight of the evidence." *Whitehead v. Food Max of Miss., Inc.*, 163 F.3d 265, 269 (5th Cir. 1998) (quoting *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998) (per curiam)).

## III.

Hacker first argues that the district court should have granted his post-trial motions because the jury unreasonably concluded that he was not disabled.[1] Hacker also argues that even if the jury's conclusion was reasonable, the district court should have granted his motion for a new trial because defendants violated the district court's orders in limine. We address each argument in turn.

## A.

Hacker fails to demonstrate that no reasonable juror could find that he was not disabled. Nor has Hacker demonstrated that the district court abused its discretion in denying his motion for a new trial. Therefore, we affirm the district court's denial of his post-trial motions as they pertain to his disability claim.

The Rehabilitation Act and Title II of the ADA prohibit state and local governments, including prisons, from discriminating on the basis of disability. 29 U.S.C. § 794; 42 U.S.C. §§ 12131-32; *see also Hale v. King*, 642 F.3d 492, 500 (per curiam) (5th Cir. 2011). To qualify for protection, a plaintiff must first show that he is a "qualified individual within the meaning of the ADA"—i.e.,

---

[1] Hacker also challenges the district court's summary judgment ruling. We "will not review the pretrial denial of a motion for summary judgment where on the basis of a subsequent full trial on the merits final judgment is entered adverse to the movant." *Black v. J.I. Case Co.*, 22 F.3d 568, 570 (5th Cir. 1994). Therefore, we do not address Hacker's arguments relating to summary judgment.

that he is disabled.[2] *See Windham v. Harris County*, 875 F.3d 229, 235 (5th Cir. 2017). The ADA defines a "disability" as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1). Hacker argues that the jury should have found that he was disabled under either subsection A or B.

**1.**

We first consider whether a reasonable juror could have concluded that Hacker did not have a physical impairment that substantially limited one or more major life activities.

To prove that he is disabled under subsection A, a plaintiff must show that he has a physical or mental impairment. *E.E.O.C. v. Chevron Phillips Chem. Co.,* 570 F.3d 606, 614 (5th Cir. 2009). But merely having an impairment is not sufficient to prove disability under the ADA; the plaintiff "also need[s] to demonstrate that the impairment substantially limits a major life activity." *Id.* "[T]o be substantially limited means to be unable to perform a major life activity that the average person in the general population can perform, or to be significantly restricted in the ability to perform it." *Hale*, 642 F.3d at 500 (alteration in original) (quoting *Chevron Phillips*, 570 F.3d at 614); *see also* 28 C.F.R. § 35.108(d)(v). The ADA's implementing regulations expressly state that "seeing" is a major life activity. § 35.108(c)(1)(i).

Considering all the evidence, the facts and inferences do not point so strongly in favor of Hacker such that a reasonable juror must find Hacker to be disabled under subsection A. At trial, the parties presented competing narratives. Hacker argued that he suffered progressive visual impairment over

---

[2] For our purposes, the analysis under the ADA and the Rehabilitation Act is the same. *Cf. Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) ("Jurisprudence interpreting either section is applicable to both.").

several years, emphasizing the numerous medical records labeling him "legally blind" or recommending cataract surgery. Defendants conceded that Hacker had cataracts but posited that Hacker had exaggerated the extent to which the cataracts hindered his vision to avoid working in the fields. They pointed to the fact that Hacker's complaints became more frequent and his reports of his vision problems became more severe when he was assigned to work in the fields in the spring of 2013. And defendants highlighted that an eye exam is necessarily based on a person's own subjective reporting of his ability to read an eye chart and thus any diagnoses of legal blindness were based on Hacker's self reports. Defendants' expert Dr. Peter Kastl also testified that a person can function with cataracts for years, or even decades. Dr. Kastl further testified that in March 2014, medical records suggested that Hacker's vision was not as poor as earlier records indicated. Although earlier records stated that his vision was 20/400 in his left eye and he was unable to read the eye chart with his right, the March 2014 record states his vision to be 20/60 in his left eye and 20/100 in his right. Thus, a reasonable jury could fairly conclude that even though Hacker had cataracts, they did not substantially limit his vision.

Hacker protests that Congress's 2008 amendment to the ADA broadened the definition of disability such that courts must broadly construe the term "in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA."[3] *See* § 35.108(a)(2)(i). But the issue here is not whether severe cataracts are a disability that would fall within the ADA; the question is

---

[3] Similarly, Hacker argues that the Ninth and Sixth Circuits have found cataracts to be a "serious medical need" in the Eighth Amendment context. But again, these arguments miss the point: the parties agree that severe cataracts may qualify as a disability, but the question is whether Hacker in fact had such cataracts. The Ninth Circuit recognized as much, acknowledging that a cataract can be "minor" with "little impact on an inmate's vision." *Colwell v. Bannister*, 763 F.3d 1060, 1067 (9th Cir. 2014) (quoting *Michaud v. Bannister*, No. 2:08-cv-1371, 2012 WL 6720602, at *5 (D. Nev. Dec. 26, 2012)).

whether Hacker actually suffered from severe cataracts. This is a factual dispute that the jury reasonably resolved in defendants' favor.

In fact, most of Hacker's arguments on appeal concern factual disputes. For example, he argues that the jury could not reasonably conclude that Hacker raised his vision problems to avoid working in the fields because he had tried to obtain cataract treatment for two years prior. It is true that Hacker first visited the eye clinic in October 2011 and on several occasions throughout 2012. But his visits picked up around the time he was assigned to field work in the spring of 2013, and it was during this time that he made his emergency request for health care, complaining of his vision. Moreover, although Hacker argued at trial that working in the tag plant was a dangerous job for someone with poor vision, he did not complain that his vision prevented him from working until he was reassigned from the tag plant to field work. Thus, there is evidence on both sides of this issue.

Hacker also argues that defendants "manufacture credibility issues regarding medical records they dislike." Hacker contends that the medical records are objective and must be believed; therefore, because the records state that he was legally blind, the jury could not have reasonably found that he was not substantially limited in a major life activity. But as Dr. Kastl testified at trial, a vision exam in which a patient reads an eye chart depends on the patient's own self-reported responses. Therefore, jurors could have judged the credibility of the various witnesses and found that Hacker had exaggerated the effect of his cataracts in his vision exams.

Dr. Kastl also pointed out that Hacker's medical records just prior to surgery showed that his visual acuity was 20/60 and 20/100—significantly better than prior records suggested. Hacker argues that Dr. Kastl failed to consider his visual field, noting that the same record states that Hacker had to "look around" his cataract to read the eye chart. Hacker points out that his own

expert, Dr. Bell, also reviewed the medical records and testified that he believed Hacker was blind. Although Hacker's argument is reasonable, it does not definitively show that no reasonable juror could have found against him. Dr. Kastl testified that he had reviewed all of Hacker's medical records, so the jurors could reasonably infer that Dr. Kastl considered Hacker's loss of visual field but found it not to be convincing. And it is possible that the jurors chose to trust the medical diagnosis of Dr. Kastl, a board-certified ophthalmologist, over the opinion of Dr. Bell, who held a doctorate in rehabilitation education rather than medicine.

Hacker's various other objections to the evidence at trial are unsuccessful. He argues that the Assistant Warden of Health Services concluded that Hacker was legally blind, but her review was based on the same records discussed above. He contests defendants' evidence that Hacker was substantially limited in major life activities because he could still play in a band and write letters, pointing to testimony that he had trouble reading other band members' cues and that his cataracts prevented him from reading and writing in some conditions but not others. And he argues that the jurors must have concluded that his ripped pectoral muscle occurred because of his inability to see, even though there was no medical record of the event. But to overturn the jury's verdict would require us to engage in the type of evidence weighing and credibility assessments prohibited on appellate review. Because there was sufficient factual evidence to support the jury's verdict against Hacker, we must let the verdict lie.

Finally, Hacker argues that the jury should have drawn an adverse inference from defendants' failure to put forward a witness to testify about Hacker's limitations. Otherwise put, Hacker argues that because defendants' employees would have observed Hacker in the prison, defendants should have called one of their own employees to testify to his ability to perform major life

activities. Because they did not present such evidence, Hacker reasons that the jury should have inferred that if defendants had called their own witness, the witness's testimony would not have been in their favor. Although we have recognized this adverse inference in some circumstances, its application is limited; the inference only applies when "the missing witness has information 'peculiarly within his knowledge.'" *United States v. Wilson*, 322 F.3d 353, 363 (5th Cir. 2003) (quoting *Streber v. Comm'r*, 138 F.3d 216, 221-22 (5th Cir. 1998)). Here, Hacker's fellow inmates witnessed his behavior and testified on his behalf. Therefore, there was no need for defendants to also put a witness on the stand, as they could rely on their cross-examination of Hacker and his fellow inmates. *Cf. id.* at 363 n.14 (noting exception to presumption where witness is equally available to both parties).

In sum, Hacker presents a reasonable case for why the jury should have found in his favor. But it is the function of the jury, not the court, to make credibility determinations and weigh the evidence. Because we cannot conclude that the jury acted unreasonably in finding that Hacker was not disabled, we find that the district court properly denied judgment as a matter of law on this issue. Additionally, it cannot be said that there was no evidence in support of such a verdict, and the district court acted within its discretion in denying Hacker's motion for a new trial.

**2.**

Hacker fails to demonstrate that the jury's conclusion that he did not have a record of impairment was unreasonable or unsupported by evidence. "An individual has a record of such an impairment if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." § 35.108(e)(1). To demonstrate a disability under subsection B, the plaintiff

10

must show that (1) he "has a record of an injury or impairment" and (2) that the "impairment limited a major life activity." *Hale*, 642 F.3d at 502.

Hacker points to instances in his medical records noting that he was legally blind or that he had cataracts. These medical records alone, he reasons, show that he is disabled under subsection B. But defendants presented evidence disputing whether he had a record of, or history of, visual impairment. *See Adams v. Rice*, 531 F.3d 936, 946 (D.C. Cir. 2008) (applying three-step test to evaluate claims of disability under subsection B, first considering whether the plaintiff has a "history of a mental or physical impairment"). Otherwise put, defendants challenged whether Hacker's medical record, when taken as a whole, reflected a history of visual impairment. As discussed above, defendants presented evidence calling into question whether Hacker's eye chart examinations could objectively measure the severity of his visual impairment. Defendants also pointed to Hacker's March 2014 medical record indicating that his vision had improved, or at least was not as bad as other medical records indicated. Additionally, defendants' medical expert testified that based on his review of Hacker's medical history as a whole, he was never legally blind. Therefore, a jury considering Hacker's medical records could reasonably conclude that they did not establish a record of impairment that substantially limited one or more major life activities. *See Cochran v. Holder*, 436 F. App'x 227, 233-34 (4th Cir. 2011) (per curiam) (unpublished) (finding no record of impairment when medical history included conflicting records: one indicating that plaintiff suffered severe hearing loss, but another indicating that he had only lost 10% of his hearing). Thus, the district court did not err in denying Hacker's renewed motion for judgment as a matter of law. And because at least some evidence supported the jury's verdict, we cannot say the district court abused its discretion in denying the motion for a new trial.

11

No. 17-30879

Because we decline to disturb the jury's verdict that Hacker was not disabled within the meaning of the ADA, we need not reach the parties' arguments concerning reasonable accommodations or exhaustion.

**B.**

In the alternative, Hacker argues that defendants violated the court's orders in limine and a new trial should be ordered on these grounds. When a movant requests a new trial "based on the submission of prejudicial information to the jury, the district court must decide whether the error is harmless by assessing whether 'the error did not influence the jury, or had but very slight effect.'" *Hollybrook Cottonseed Processing, L.L.C. v. Am. Guar. & Liab. Ins. Co.*, 772 F.3d 1031, 1034 (5th Cir. 2014) (quoting *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1308 (5th Cir. 1977)). We afford the district court "a great deal of discretion in determining whether an objectionable question is so prejudicial as to require a retrial" because the district court judge "is in a far better position to measure the effect of an improper question on the jury than an appellate court which reviews only the cold record." *Id.* (quoting *O'Rear*, 554 F.2d at 1308).

Hacker argues that defendants violated the orders in limine in three ways. First, they referenced the medical care Hacker received in 2011 and 2012 in their opening statement, thus violating the court's order excluding evidence that did not "bear on the issues related to [Hacker's] cataracts." Hacker argues that Dr. Lavespere also testified about this treatment and defendants referenced the treatment in closing, stating: "You heard the whole story, beginning in 2011. There were issues going on. The doctors at Angola, including Dr. Lavespere, looked at it, tried to find out what was going on." Second, defendants said that "the testimony and the evidence is going to be Jason Hacker broke all the rules" in their opening statement. Hacker argues that this violated the parties' agreement that defendants would not reference

12

Hacker's disciplinary records. Third, defendants began their opening statement with "What's this case about? Well, Jason Hacker is serving a life sentence at Angola where he has been since the year—early 2000s," which Hacker argues violated the order in limine prohibiting references to "the specific crimes for which [Hacker] was convicted or the conduct which led to his conviction." In addition, Hacker argues that he was prejudiced by defense-expert Dr. Lavespere's inflammatory testimony that "to be sent to the field is the ultimate slap in the face . . . . You know, some of [the inmates] view it as slavery. Some of the black ones in particular view it as slavery."

We do not find that the district court abused its discretion by denying Hacker's motion for a new trial. The testimony regarding Hacker's medical history was arguably related to defendants' efforts to diagnose Hacker's cataracts, thus within the scope of the court's order, which allowed "[e]vidence of medical care given in connection with his cataract condition." Defendants' reference to Hacker's life sentence complied with the letter of the court's order in limine, which only prevented defendants from referencing "the specific crimes for which [Hacker] was convicted or the conduct which led to his conviction." And the statement that Hacker "broke all the rules" was made while discussing Hacker's counsel's opening statement that Hacker had "kept on the straight and arrow [sic]." To the extent the statement can be interpreted to refer to Hacker's disciplinary record, the reference was vague, and it is unlikely that a juror would recognize it was in connection to any disciplinary infraction.

More importantly, even if these statements violated the court's orders in limine, Hacker has not shown that he was prejudiced by these violations other than arguing that the jury returned a verdict against him. But the references were brief and vague, and defendants did not submit any other evidence on these topics. Hacker analogizes his case to *Hollybrook*, but the *Hollybrook*

plaintiff was able to draw a connection between the defendant's conduct and the prejudice suffered. There, the defendant elicited testimony that the plaintiff had made a settlement demand for $750,000. *Hollybrook*, 772 F.3d at 1033. The testimony was elicited on the next-to-last day of an eleven-day trial, and the jury awarded the plaintiff $1,750,000 in damages—well below the damages the plaintiff claimed it had suffered. *Id.* The district court granted a new trial, at which the plaintiff ultimately won a $6 million award. *Id.* On appeal, we affirmed the district court's order granting the new trial because there was "no discernable basis" for the jury's initial award and it seemed that the jurors had simply added $1 million to the settlement demand. *Id.* at 1034. Further, the defendant could not offer another explanation for how the jury arrived at its verdict. *Id.* In contrast, as described above, the jury's verdict in this case was reasonable and supported by evidence.

Likewise, there is no evidence that Hacker—a white man—was prejudiced by Dr. Lavespere's inflammatory racial statements. Although Hacker cites *United States v. Sanchez*, 482 F.2d 5 (5th Cir. 1973), in which we reversed a defendant's conviction when the prosecutor's argument was "replete with racial and political undertones," the racially inflammatory comments in *Sanchez* were directed at the defendant. *Id.* at 8. Hacker provides no explanation for why the objectionable behavior of an opposing party's witness would prejudice his own case when not directed at him. It was also within the district court's discretion to avoid instructing the jury to ignore this testimony to avoid drawing further attention to it. *Cf. Caldarera v. E. Airlines, Inc.*, 705 F.2d 778, 782 (5th Cir. 1983) ("The trial court may exercise judgment on the basis of his own opinion of the effect the evidence will have, considering the courtroom surroundings.").

Therefore, we conclude that the district court did not abuse its discretion in denying Hacker's motion for a new trial.

No. 17-30879

## IV.

For the foregoing reasons, we AFFIRM the judgment of the district court.