# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 15, 2020

No. 19-20194

Lyle W. Cayce
Clerk

JACQUELINE SMITH, Independent Administrator of the Estate of Danarian
Hawkins, Deceased,

>            Plaintiff - Appellant

v.

HARRIS COUNTY, TEXAS,

>            Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before KING, COSTA, and HO, Circuit Judges.

KING, Circuit Judge:

Danarian Hawkins committed suicide while incarcerated in the Harris County Jail. Jacqueline Smith, his mother, is now suing Harris County for compensatory damages under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. These laws allow Smith to recover damages only if she can prove that Harris County or its employees intentionally discriminated against Hawkins. Because Smith cannot prove that Hawkins was subjected to intentional discrimination, the district court correctly granted summary judgment to Harris County, and we AFFIRM.

No. 19-20194

**I.**

Between 2009 and his death in 2014, Hawkins spent much of his time imprisoned in the Harris County Jail. On several occasions, Hawkins's suicide attempts, suicidal statements, and self-harming behavior caused him to be transferred to the jail's Mental Health Unit (MHU), but his stays never lasted longer than two weeks. In the eighteen months before his death, Hawkins spent his time outside the MHU housed in administrative separation. Hawkins was placed in administrative separation because he was considered a threat to the safety of other prisoners.

Hawkins made several suicide attempts at the Harris County Jail. In September 2009, Hawkins attempted to hang himself by tying his shirt into a knot. In June 2010, he was found kneeling in a vestibule trying to hang himself with his pants tied to a door handle. The following month, he was again discovered attempting to tie his pants to the handle of a door; Hawkins reported at that time that he was "feeling suicidal and homicidal." In June 2011, a guard discovered Hawkins in his cell with a sheet wrapped around his neck and the other end of the sheet tied around the rail of the top bunk. Hawkins's next suicide attempt took place in April 2013, when Detention Officer Christopher Cano found Hawkins in his cell with one end of a bed sheet tied to the smoke detector on the ceiling, and the other end tied tightly around his neck. In July 2013, Hawkins overdosed by taking approximately 100 pills, which he had stockpiled by hiding the pills under his tongue while "taking" his medication at the jail's medical center.

On January 17, 2014, Detention Officer Timothy Owens encountered Hawkins outside of his cell with one end of a sheet tied around his neck. Hawkins was attempting to tie the other end of the sheet to the top rail of the cell block's upper deck. When Owens asked Hawkins what he was doing, Hawkins said that he was hearing voices telling him to kill himself. Owens

No. 19-20194

restrained Hawkins and placed him in a suicide smock so he could not hurt himself.

Hawkins was subsequently transferred to the MHU, where he spent the next two weeks. During that time, he was prescribed additional medication and met regularly with psychiatrist Dr. Enrique Huerta. On January 31, 2014, after beginning to observe improvement in Hawkins's condition, Dr. Huerta discharged Hawkins from the MHU. Upon Hawkins's discharge, jail classification staff decided to return Hawkins to administrative separation in the same cell block where Hawkins had attempted to kill himself by tying a bed sheet to the smoke detector.

On February 4, 2014, the day before Hawkins committed suicide, he spoke to Chelsea Ford, a Texas-licensed practitioner of the healing arts, during her twice-weekly rounds. As part of her duties, Ford was responsible for checking to see whether any prisoners were suicide risks. Hawkins told Ford that he had recently attempted to commit suicide and that the Illuminati "is watching me and makes me want to kill myself." When Ford pressed for more information, Hawkins indicated that he was not presently experiencing suicidal ideation. Ford told Hawkins to notify her or others if his suicidal thoughts increased or if he felt the need to act on them, and Hawkins apparently agreed to comply. Based on this interaction, Ford did not believe that Hawkins was suicidal.

At approximately 10:02 P.M. the following day, Detention Officer Cano—who rescued Hawkins during his April 2013 suicide attempt—began conducting an observation round in Hawkins's cell block. When he reached Hawkins's cell at 10:10 P.M., he noticed that a towel was covering the cell window, which was a violation of jail policy. Cano knocked on the door to get Hawkins's attention; when there was no response, Cano unlocked the pan-hole door and peered through. Cano saw Hawkins hanging from the smoke detector

on the ceiling, with a sheet tied around his neck. He called for backup and, with assistance, was able to remove the sheet from the smoke detector and get Hawkins down on his back in the bunk. As other officers and inmates attempted to loosen and untie the knot around Hawkins's neck to free his air way, Cano began performing CPR. Nurses soon arrived and carried Hawkins on a stretcher to the jail's clinic. Hawkins was pronounced dead at 10:43 P.M.

Smith filed suit against Harris County seeking to recover compensatory damages on behalf of Hawkins's estate. According to Smith, Harris County violated Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act by failing to: (i) replace the sheet on Hawkins's bed with a knot-proof suicide blanket; (ii) modify the smoke detector in Hawkins's cell such that it could not be used as a tie-off point for a noose; (iii) refer Hawkins to the MHU following his conversation with Ford; (iv) remove the towel covering Hawkins's window on the night he died; (v) follow the jail policy requiring twenty-five-minute observation rounds in the administrative-separation section, where Hawkins was housed; and (vi) monitor Hawkins every five to ten minutes.

Harris County moved for summary judgment on all of Smith's claims. Among other things, Harris County argued that Smith "has no evidence of intentional discrimination, which is required for compensatory damages." Smith conceded that she needed to prove intentional discrimination to recover compensatory damages, but she argued that she had introduced sufficient evidence to survive summary judgment. The district court disagreed on the latter point and granted Harris County's motion. This appeal followed.

## II.

We review the district court's summary-judgment ruling de novo, applying the same standards as the district court. *Windham v. Harris County*, 875 F.3d 229, 234 (5th Cir. 2017). Summary judgment is appropriate if "the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For this purpose, factual disputes are material if they "might affect the outcome of the suit under the governing law," and they are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> When a defendant moves for summary judgment and identifies a lack of evidence to support the plaintiff's claim on an issue for which the plaintiff would bear the burden of proof at trial, then the defendant is entitled to summary judgment unless the plaintiff is able to produce "summary judgment evidence sufficient to sustain a finding in plaintiff's favor on that issue."

*James v. State Farm Mut. Auto. Ins. Co.*, 743 F.3d 65, 68 (5th Cir. 2014) (quoting *Kovacic v. Villarreal*, 628 F.3d 209, 212 (5th Cir. 2010)). We may affirm a grant of summary judgment on any grounds supported by the record. *Cadena v. El Paso County*, 946 F.3d 717, 723 (5th Cir. 2020).

## III.

The nondiscrimination principle that was ultimately enacted as § 504 of the Rehabilitation Act was originally proposed in 1972 as an amendment to Title VI of the Civil Rights Act of 1964. *Alexander v. Choate*, 469 U.S. 287, 295 n.13 (1985). It should come as no surprise, therefore, that the statutory language enacted one year later almost echoes Title VI's prohibition on racial discrimination. *Compare* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."), *with* 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."). It is

likewise unsurprising that the Rehabilitation Act incorporates, for Section 504 violations, the rights and remedies of Title VI. *See* 29 U.S.C. § 794a(a)(2) ("The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance . . . under section 794 of this title."); *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 996 (5th Cir. 2014).

Building on the Rehabilitation Act's protections, Congress passed the Americans with Disabilities Act in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). In essence, Title II of the ADA extends Section 504 of the Rehabilitation Act such that it applies to all public entities while simultaneously weakening its causation requirement. *Compare id.* § 12132 ("[N]o qualified individual with a disability shall, **by reason of such disability**, be excluded from participation in or be denied the benefits of the services, programs, or activities **of a public entity**, or be subjected to discrimination by any such entity." (emphasis added)), *with* 29 U.S.C. § 794(a) (applying to programs and activities "receiving Federal financial assistance" and prohibiting discrimination "solely by reason of" disability). The ADA defines public entities to include local governments and their instrumentalities, 42 U.S.C. § 12131(1)(A)-(B), such as county jails, *see Cadena*, 946 F.3d at 723. By design, the "remedies, procedures, and rights" applicable to Section 504 of the Rehabilitation Act, i.e., the rights, remedies, and procedures available under Title VI, are also applicable to Title II of the ADA. 42 U.S.C. § 12133; *accord Cadena*, 946 F.3d at 723. The close relationship between Section 504 of the Rehabilitation Act and Title II of the ADA means that precedents interpreting either law generally apply to both. *Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002).

No. 19-20194

Like Title VI, the Rehabilitation Act and Title II of the ADA allow private plaintiffs to enforce their prohibitions on discrimination.

> To establish a prima facie case of discrimination under the ADA, a plaintiff must demonstrate: (1) that he is a qualified individual within the meaning of the ADA; (2) that he is being excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability.

*Melton v. Dall. Area Rapid Transit*, 391 F.3d 669, 671-72 (5th Cir. 2004). The Supreme Court has held that modern prisons conduct many "services, programs, or activities" that confer "benefits" on inmates, such as recreational activities, medical services, and vocational programs. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

In addition to prohibiting discrimination, the ADA and the Rehabilitation Act—unlike Title VI—"impose upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." *Bennett-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005); *see Tennessee v. Lane*, 541 U.S. 509, 531 (2004) (observing that "failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion"). An accommodation is reasonable if "it does not impose undue financial or administrative burdens or 'fundamentally alter the nature of the service, program or activity.'" *Cadena*, 946 F.3d at 724 (quoting 28 C.F.R. § 35.130(b)(7)). "To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015). Plaintiffs ordinarily satisfy the knowledge element by showing that they identified their disabilities as well as

7

the resulting limitations to a public entity or its employees and requested an accommodation in direct and specific terms. *Windham*, 875 F.3d at 237. "When a plaintiff fails to request an accommodation in this manner, he can prevail only by showing that 'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents." *Id.* (quoting *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996)).

Even when plaintiffs successfully prove a disability-discrimination or a failure-to-accommodate claim, they "may only recover compensatory damages upon a showing of intentional discrimination." *Delano-Pyle*, 302 F.3d at 574; *accord Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 574 (5th Cir. 2018). Our precedents have not "delineate[d] the precise contours" of this showing, but we have relied "on the widely accepted principle that intent requires that the defendant at least have actual notice." *Miraglia*, 901 F.3d at 575. Unlike other circuits, we have not held that deliberate indifference suffices. *Id.*; *see also S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 262-63 (3d Cir. 2013) (collecting, and agreeing with, cases from five other circuits).

## IV.

The district court did not err when it concluded that Smith could not recover compensatory damages on her failure-to-accommodate claims. Smith identifies six potential accommodations that, she claims, would have saved Hawkins's life: (i) replacing the sheet on Hawkins's bed with a knot-proof suicide blanket; (ii) modifying the smoke detector in Hawkins's cell such that it could not be used as a tie-off point; (iii) removing the towel covering Hawkins's window; (iv) referring Hawkins to the MHU following his conversation with Ford on the day before his death; (v) following jail policy and conducting twenty-five-minute observation rounds in the administrative-

No. 19-20194

separation section of the jail; and (vi) monitoring Hawkins in particular every five to ten minutes.[1] But Smith has not shown that any Harris County employee intentionally discriminated against Hawkins by failing to provide these accommodations.[2]

## A.

Harris County did not intentionally discriminate against Hawkins by failing to remove the towel covering his window or by failing to conduct observation rounds every twenty-five minutes. At approximately 9:53 P.M. on the night Hawkins died, Detention Officer Marvin Perkins observed Hawkins while on his rounds. At 10:10 P.M., Detention Officer Cano was performing his rounds and saw that the window of Hawkins's cell was covered by a towel, and Officer Cano immediately removed that towel. There is no evidence that anyone employed by Harris County was aware that Hawkins's window was covered before that point, so Harris County did not intentionally discriminate against Hawkins by failing to remove it sooner. *See Miraglia*, 901 F.3d at 575 ("[A] defendant must have notice of the violation before intent will be imputed."). Similarly, there is no evidence that Harris County intentionally discriminated against Hawkins by failing to conduct twenty-five-minute

---

[1] Smith does not claim that either Dr. Huerta's decision to discharge Hawkins from the MHU on January 31, 2014 or Hawkins's lack of a cellmate violated the ADA. And rightly so. Smith likely could not have asserted an ADA claim based on Dr. Huerta's discharge decision, because "the ADA does not typically provide a remedy for negligent medical treatment." *Cadena*, 946 F.3d at 726. And while Hawkins might not have been able to commit suicide if he had a cellmate, providing him with a cellmate likely would not have been a reasonable accommodation, because Hawkins was considered a threat to the safety of other prisoners.

[2] For the purposes of this appeal, we assume without deciding that Hawkins's mental-health issues mean that he was a qualified individual with a disability. On a similar note, Harris County conceded at oral argument that it could be held vicariously liable for the actions of its employees.

No. 19-20194

observation rounds; on the contrary, Officer Perkins observed Hawkins seventeen minutes before Officer Cano arrived at Hawkins's cell.[3]

## B.

Non-medical employees at the Harris County Jail did not intentionally discriminate against Hawkins by failing to implement the suicide-prevention methods identified by Smith, i.e., providing a knot-proof blanket, modifying the smoke detector in Hawkins's cell, or monitoring Hawkins more frequently. In the context of a failure-to-accommodate claim, intentional discrimination requires at least actual knowledge that an accommodation is necessary. *See Cadena*, 946 F.3d at 724 ("[T]his court has affirmed a finding of intentional discrimination when a county deputy knew that a hearing-impaired suspect could not understand him, rendering his chosen method of communication ineffective, and the deputy made no attempt to adapt."). If a defendant attempts to accommodate a disability, then intentional discrimination requires knowledge "that further accommodation was necessary." *Id.* at 726.[4]

Harris County attempted to accommodate Hawkins's mental-health issues by referring him to the MHU for psychiatric treatment on January 17, 2014. Hawkins was discharged after he showed improvement on a new medication regimen. While hindsight tells us that Hawkins's medical

---

[3] Smith argues that, for various reasons, a reasonable jury would not have been required to credit Perkins's observation log showing that he observed Hawkins at 9:53 P.M. Smith must, however, do more than rebut Harris County's exculpatory evidence to survive summary judgment. *See Fla. Dep't of Ins. v. Chase Bank of Tex. Nat'l Ass'n*, 274 F.3d 924, 928 (5th Cir. 2001) ("After a defendant properly moves for summary judgment, the non-movant plaintiff must bring forward sufficient evidence to demonstrate that a genuine issue of material fact exists on every element of a claim."). Even if questions regarding the accuracy of Perkins's observation log were sufficient to show that he failed to conduct his final set of rounds on the night of February 5, 2014, such a failure would, at most, demonstrate negligence or recklessness, not intentional discrimination.

[4] Ordinarily, these indications take place after an attempt to accommodate a disability is made, but we do not consider, and therefore do not decide, whether an attempt to accommodate a disability could be so inadequate that there would be contemporaneous knowledge that further accommodations were necessary.

10

treatment proved inadequate, non-medical employees at the jail had no reason to believe, much less actual knowledge, that Hawkins needed additional accommodations following his discharge. *Cf. Miranda v. County of Lake*, 900 F.3d 335, 343 (7th Cir. 2018) ("When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention."). Accordingly, the non-medical staff at the Harris County Jail did not intentionally discriminate against Hawkins by failing to provide additional accommodations, such as the suicide-prevention measures identified by Smith.

## C.

We also conclude that Chelsea Ford, the nurse who spoke with Hawkins the night before he died, did not intentionally discriminate against Hawkins by failing to refer him to the MHU or by failing to implement suicide-prevention measures. Again, Hawkins received an accommodation for his mental-health issues, i.e., two weeks of psychiatric treatment at the MHU, so to establish intentional discrimination, Smith must show that there were indications that further accommodation was necessary. Smith claims that Ford received such an indication when she spoke with Hawkins.

In her report documenting her conversation with Hawkins, which she created before his death, Ford wrote:

> PT [patient] stood when writer approached, PT is known to this writer from previous housing in admin separation. PT verbalized he was just discharged from [the MHU] after "I tried to hang myself at [cell block] 701." PT has had several past suicide attempts, with one nearly fatal overdose that resulted in extensive hospital stay. Writer encouraged PT notify myself or deputies when SI [suicidal ideation] worsens and he feels the need to act on thoughts. PT states "the illuminate is watching me and makes me want to kill myself." PT reports he is presently not experiencing SI and agrees to notify writer if symptoms worsen.

11

Ford seems to have understood Hawkins to be describing his past experiences and symptoms, not his current mental state, and Ford's deposition testimony confirms that Hawkins told her that he was not presently experiencing suicidal ideation. She also testified that, after speaking with Hawkins, she did not believe that he was actively suicidal.

In retrospect, Ford's assessment may have been wrong, but there is no evidence suggesting that her report or her testimony were dishonest. Smith argues that Hawkins's statements to Ford were indicative of a mental-health issue such that Ford violated jail policy by failing to refer Hawkins to the MHU. Even if Smith were correct and Ford violated jail policy, that would not convert a perhaps-negligent mistake into intentional discrimination or deliberate indifference. *Cf. Anderson v. Dallas County*, 286 F. App'x 850, 862 (5th Cir. 2008) (concluding, in a jail-suicide case, that "no single individual" acted with deliberate indifference even though "staff at the Jail collectively may have acted negligently, or even grossly negligently, by ignoring Jail procedures"). Because Ford, like the other employees at the Harris County Jail, did not intentionally discriminate against Hawkins, the district court correctly dismissed Smith's claims for compensatory damages.

## V.

For the foregoing reasons, we AFFIRM the judgment of the district court.

12