# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 3, 2021

Lyle W. Cayce
Clerk

No. 20-30110

Rosie Phillips, *next friend of* J.H.,

*Plaintiff—Appellant*,

*versus*

Stephen W. Prator, *as the public entity responsible for the* Caddo Parish Sheriff's Office

*Defendant—Appellee*.

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 5:18-CV-00994

Before Graves, Costa, and Engelhardt, *Circuit Judges*.
Gregg Costa, *Circuit Judge*:*

Something upset J.H. on August 31, 2017, prompting him to leave his special needs classroom and linger in the hallway outside. J.H., a nonverbal student with severe autism, was reluctant to return to class. School officials at first tried to coax him back to the classroom, then changed course once

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 20-30110

J.H. began to tussle with them. A sheriff's deputy was called to the scene; a standoff ensued. It ended when J.H. kicked at a school administrator and the deputy responded by firing his Taser. We must determine whether the lawsuit J.H.'s mother filed over this incident plausibly alleges an intentional failure to accommodate J.H.'s disability.

I.

Rosie Phillips's son started tenth grade at a new school: Northwood High School in Shreveport, Louisiana. Attending a new school was "extremely stressful" for J.H., who has "severe and profound autism" and is nonverbal. At Northwood, J.H. received special educational services, including placement in "a small, self-contained environment with other students with severe and profound disabilities."

Like many school districts around the country, the Caddo Parish School Board hires local police to provide security services at area schools. The School Board contracted with Sheriff Stephen Prator to deploy "armed Sheriff's deputies . . . [that would] perform security and law enforcement activities on a continuous basis" at schools across Shreveport. In August 2017, the task of patrolling Northwood fell to Deputy Nunnery. That meant Nunnery was on duty when J.H. "became agitated and triggered by an interaction he had with a staff person" in his special needs classroom. Whatever upset J.H. that day—Phillips believes that a Northwood staff person asked him to stop rubbing his stomach against the wall—it caused J.H. to leave the classroom and enter the hallway, where a security camera captured the incident that would soon unfold. The following facts are taken

2

No. 20-30110

from Phillips's complaint as well as the security footage referenced in her pleadings.[1]

For several minutes after exiting his classroom, J.H. compulsively drank from the water fountain, "st[ood] in the hallway, and plac[ed] his fingers in his ears." A man who appears to be a school official then began trying to coax J.H. back into the classroom. Over the next few minutes, J.H. sometimes followed the school official back into the classroom, but other times walked or ran away from him, and at one point even charged down the hallway and jumped in his direction. During that time, J.H. continued to hold his fingers to his ears and repeatedly returned to drink from the water fountain. The school official eventually moved in front of the classroom door and barred J.H. from re-entering. Two school administrators then entered the hallway and approached J.H., who remained standing with his fingers in his ears. J.H. repeatedly "attempt[ed] to re-enter his classroom" while the administrators "forcibly blocked" him from doing so.

After a couple of "minor struggle[s]" between J.H. and the administrators, Nunnery arrived on the scene. When Nunnery appeared, J.H. had just been blocked from entering the classroom and was standing against another doorway kicking at administrators trying to approach him. J.H. ran towards an administrator, but collided with the wall, slid down to the floor, and again kicked in the direction of the adults nearby. By that point, Nunnery had drawn his Taser. When J.H. got to his feet, he once again placed his fingers in his ears and stood "leaning against the hallway wall with

_____

[1] The district court considered the video when evaluating the defendant's Rule 12(c) motion, noting that Phillips referred to the video in her complaint and that its contents were central to her claims. Phillips agrees that this was proper. The video depicts the hallway where the encounter between J.H. and Deputy Nunnery took place but does not include any sound.

his head down." For five and a half minutes, Nunnery joined three administrators in a semi-circle around J.H., who "remained essentially motionless" while exhibiting "predictable manifestations" of his autism. Nunnery "repeatedly instructed J.H. to 'calm down' and said that he was 'not going to let [J.H.] hurt him.'"

J.H. eventually made another attempt to re-enter the classroom, but he was again blocked by school administrators. He went back to standing against the wall with his fingers in his ears for about a minute before rushing toward one of the administrators, then turning around and kicking in another administrator's direction. Nunnery responded by striking J.H. with his Taser, causing J.H. to "fall[] face down to the floor where he remained dazed and motionless." J.H. lay on the floor "in a pool of his own urine" for thirteen minutes until emergency responders and Phillips arrived on scene.

Phillips sued in federal court on behalf of her son, claiming violations of Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. As a defendant she named Sheriff Prator in his official capacity, which means this is a suit against the Sheriff's Office.[2] *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 414 (5th Cir. 2004) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). She alleged that the Sheriff's Office—through Prator and his subordinate Nunnery—failed to accommodate J.H.'s disability and intentionally discriminated against J.H. because of his disability. Phillips sought damages as well as a declaratory judgment that the Sheriff's Office violated the ADA and Rehabilitation Act.

---

[2] Suits under the ADA and Rehabilitation Act must be brought against a "public entity" as opposed to individuals. *See Smith v. Harris County*, 956 F.3d 311, 317 (5th Cir. 2020) (citing 42 U.S.C. §§ 12131–32); *Smith v. Hood*, 900 F.3d 180, 184 n.6 (5th Cir. 2018) ("We note that the ADA cannot be assessed against an individual.").

No. 20-30110

Prator moved for a judgment on the pleadings under Federal Rule of Civil Procedure 12(c). The district court granted the motion and dismissed Phillips's claims with prejudice. On appeal, Phillips argues that the district court erred in holding that she failed to state a claim for intentional discrimination.

## II.

Plaintiffs may sue under the Title II of the ADA when a public entity discriminates against them because of their disability, including by failure to accommodate their disability. *Windham v. Harris County*, 875 F.3d 229, 235–36 (5th Cir. 2017) (discussing 42 U.S.C. §§ 12131–33). Section 504 of the Rehabilitation Act prohibits essentially identical conduct, so the two provisions are interpreted in tandem. *See Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 & n.5 (5th Cir. 2002) (discussing 29 U.S.C. § 794(a)). Although these laws may require certain accommodations regardless of a defendant's intent, plaintiffs can only recover damages when a defendant engaged in intentional discrimination. *Id.* at 574.

Most circuits have held that ADA plaintiffs can establish intentional discrimination by proving that defendants acted with "deliberate indifference" to the strong likelihood that their conduct would violate the plaintiffs' rights.[3] *See Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 574 (5th Cir. 2018). This court, however, has "declined to adopt a

---

[3] *See Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009); *S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 263 (3d Cir. 2013); *Lacy v. Cook County*, 897 F.3d 847, 863 (7th Cir. 2018); *Meagley v. City of Little Rock*, 639 F.3d 384, 389 (8th Cir. 2011); *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008); *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999); *Liese v. Indian River County Hosp. Dist.*, 701 F.3d 334, 345 (11th Cir. 2012). *But see Carmona-Rivera v. Puerto Rico*, 464 F.3d 14, 18 (1st Cir. 2006) (indicating intentional discrimination requires more than deliberate indifference).

specific standard of intent." *Id.* We have instead noted that our "cases to have touched on the issue require 'something more than deliberate indifference.'" *Cadena v. El Paso County*, 946 F.3d 717, 724 (5th Cir. 2020) (quoting *Miraglia*, 901 F.3d at 575).

We have offered some guidance on what conduct rises to the level of an intentional failure to accommodate. Most importantly, "a defendant must have notice of the violation before intent will be imputed." *Miraglia*, 901 F.3d at 575. We have therefore held that "intentional discrimination requires at least actual knowledge that an accommodation is necessary." *Smith v. Harris County*, 956 F.3d 311, 319 (5th Cir. 2020) (citing *Cadena*, 946 F.3d at 724). "If a defendant attempts to accommodate a disability, then intentional discrimination requires knowledge 'that further accommodation was necessary.'" *Id.* (quoting *Cadena*, 946 F.3d at 726). The requisite notice comes from the plaintiff's request for an accommodation or from facts establishing that "'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent'" to the defendant. *Id.* at 317–18 (quoting *Windham*, 875 F.3d at 237).

Our caselaw reveals what an intentional failure to accommodate looks like in practice. Nearly twenty years ago, we affirmed a jury's finding that a county deputy intentionally discriminated against a hearing-impaired plaintiff by declining to "try[] a more effective form of communication" once he became aware that the plaintiff "was not understanding his verbal commands." *Delano-Pyle*, 302 F.3d at 575. We then determined, in an unpublished case, that plaintiffs raised a fact issue as to intentional discrimination with evidence that defendants "ignored clear indications that they were dealing with a hearing-impaired person with special communication needs" and "failed on several occasions to provide effective aids" despite "repeated requests" from the plaintiffs. *Perez v. Drs. Hosp. at Renaissance, Ltd.*, 624 F. App'x 180, 185–86 (5th Cir. 2015). Finally, we held

that a jury could find officials at a county jail intentionally discriminated against an ADA plaintiff when they took away her wheelchair, gave her crutches, and continued to deny her wheelchair access even after they saw her struggle to walk. *Cadena*, 946 F.3d at 726. Together, these examples provide a yardstick against which to measure the allegations in Phillips's complaint.

Notably, the cases we have just discussed were decided on a factual record, either at the summary judgment stage or after trial. The same is true for nearly every appellate decision on which the defendant relies. *See Smith*, 956 F.3d at 318–20 (affirming summary judgment because plaintiff presented no evidence that defendants knew of the need to accommodate decedent); *Miraglia*, 901 F.3d at 575–76 (reversing damages award after determining that defendant lacked notice of ADA violation); *Taylor v. Principal Fin. Grp.*, 93 F.3d 155, 165–66 (5th Cir. 1996) (affirming summary judgment because plaintiff failed to adduce evidence that defendant had notice of necessary accommodations).[4] That these cases were resolved after at least some factual development is not surprising, as intent is "quintessentially" a fact issue. *Thompson v. Syntroleum Corp.*, 108 F. App'x 900, 902 (5th Cir. 2004).

As this case is at the pleading stage, that factual development has not yet occurred. So the question is not whether there is evidence to support the claim of intentional discrimination but whether the complaint plausibly alleges such discrimination. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating that the Rule 12 standard is whether the pleadings "contain sufficient

---

[4] The only appellate decision the defendant cites that affirms a Rule 12 dismissal based on lack of intent is an unpublished decision addressing a *pro se* complaint that contained allegations undermining any inference of disability-based discrimination. *See Back v. Tex. Dep't of Crim. Just. Corr. Insts. Div.*, 716 F. App'x 255, 258 (5th Cir. 2017) (noting that the plaintiff's own allegations suggested that the defendant's conduct "had nothing to do with his disability").

factual matter . . . to 'state a claim to relief that is plausible on its face.'" (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007))); *see also Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019) (noting that plausibility is the pleading standard for discrimination cases (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002))).

In assessing whether Phillips has plausibly alleged claims of discrimination, we separately consider the allegations involving Sheriff Prator and those involving Deputy Nunnery. The ADA and Rehabilitation Act are vicarious liability statutes, meaning the Sheriff's Office can be held liable for discrimination by either employee. *T.O. v. Fort Bend Indep. Sch. Dist.*, 2 F.4th 407, 417 (5th Cir. 2021) (citing *Delano-Pyle*, 302 F.3d at 574–75). But because the parties and district court evaluated the conduct of each employee separately, we will do the same.

We agree with the district court that Phillips has not plausibly alleged that Prator's own conduct amounted to intentional discrimination. Though Phillips alleges that the Sheriff's Office "chose to provide in-school security at [Northwood] despite their lack of training on accommodating individuals with autism," she does not plead any facts to support her claim that Prator knew such training was necessary at the time of the incident. *See J.V. v. Albuquerque Pub. Schs.*, 813 F.3d 1289, 1298 (10th Cir. 2016). Nor does she allege that Prator, who never interacted with J.H., would have had any particular knowledge about J.H.'s disability or need for accommodation.

As to Nunnery, however, the allegation that he knew an accommodation was necessary is at least plausible. Shortly after Nunnery arrived on the scene, J.H. began sticking his fingers in his ears and standing motionless against the wall with his head down. As Nunnery looked on, J.H. continued to display these obvious signs of his disability for more than five minutes. Given that Nunnery observed clear signals that J.H. could not

comprehend what was happening, it is plausible that he knew J.H. needed an accommodation.

The question remains whether Phillips has alleged that Nunnery understood what he needed to do to accommodate J.H. Phillips describes how Nunnery, on notice that some form of accommodation was necessary, joined three school administrators in flanking J.H., repeatedly told J.H. to "calm down," and warned J.H. that he wouldn't let J.H. hurt him. According to the complaint, "Nunnery did not take any steps to de-escalate the situation," and instead "conveyed a threatening and confrontational attitude to J.H."

To the extent Nunnery's actions can be interpreted as attempts to accommodate J.H.'s autism, Phillips plausibly alleges that Nunnery was aware such efforts were insufficient. J.H. reacted to Nunnery by continuing to stick his fingers in his ears and remaining planted against the wall. Still, Nunnery declined to adjust to these clear indications that his attempts to make J.H. understand him were ineffective. As Phillips recounts, Nunnery could have implemented a number of commonsense tactics to take control of the situation without resorting to his Taser. Yet Nunnery did not use simple language or speak in a quiet, calm voice; did not give J.H. clear and concise directions; did not provide J.H. adequate personal space; and did not consult other adults on scene who knew J.H. Phillips alleges that these omissions were intentional, stating that Nunnery was "purposeful in his choices." By alleging that Nunnery failed to heed obvious signs that a new approach was warranted, Phillips pleads facts that could support a finding of intentional discrimination. *See Delano-Pyle*, 302 F.3d at 575 ("Instead of viewing these actions as an indication that Pyle was not understanding his verbal commands and trying a more effective form of communication, Daniel only became annoyed and continued to further instruct Pyle through verbal communication.").

Although it is a close call given the rapidly unfolding events that transpired at the school, we thus conclude that the allegations that Nunnery understood the limitations imposed by J.H.'s autism and chose not to accommodate them "raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted). Of course, time will tell if there is any evidence to support the allegations about what Nunnery knew and when he knew it. But for now, "[t]he issue is not whether [the] plaintiff will ultimately prevail but whether [she] is entitled to offer evidence to support [her] claims." *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996), *vacated on other grounds*, 113 F.3d 1412 (5th Cir. 1997). Because Phillips has stated a plausible claim of intentional discrimination against the Sheriff's Office based on Nunnery's conduct, she is entitled to proceed to the evidence-gathering phase of her lawsuit.

* * *

The judgment of the district court is AFFIRMED IN PART and REVERSED IN PART. The case is REMANDED for further proceedings consistent with this opinion.