# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
November 21, 2023

Lyle W. Cayce
Clerk

_____

No. 22-40518
_____

Olivia Sligh,

*Plaintiff—Appellant*,

*versus*

City of Conroe, Texas; Tyson Sutton; Alexis Alias Montes; Montgomery County, Texas,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-1417

_____

Before King, Smith, and Elrod, *Circuit Judges*.

Per Curiam:[*]

Olivia Sligh appeals the dismissal of (1) an excessive force claim under 42 U.S.C. § 1983; (2) a § 1983 failure-to-intervene/bystander liability claim; (3) a § 1983 municipal liability claim; and (4) various failure-to-accommodate claims under Title II of the ADA and § 504 of the Rehabilitation Act. We AFFIRM.

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 22-40518

## I.

This case involves a plaintiff who was bitten and injured by a police dog. The below facts are mainly taken from the operative complaint. At 1:39 a.m. on July 5, 2018, Plaintiff-Appellant Olivia Sligh's partner called 911 to report that Sligh was suicidal, had hurt herself, and had left her house on foot. Sligh's partner requested an ambulance, and he indicated that Sligh was unarmed and not a violent person. The Montgomery County Sheriff's Office notified the City of Conroe of the emergency medical call and requested a canine officer if available. Tyson Sutton, a police officer employed by the City of Conroe, and Alexis Alias Montes, a deputy employed by the Montgomery County Sheriff's Office, responded to the call. Sutton brought along Thor, a trained K9 police dog. These two officers, the City of Conroe, and Montgomery County are the Defendants-Appellees in this action.

The complaint alleges that when the officers located Sligh, Sutton shined a flashlight in Sligh's face as Thor barked and lunged at her. Montes grabbed Sligh, who pulled away. Sutton then sicced Thor on Sligh, and Thor initially bit Sligh in the upper thigh. Sligh sat down, and Sutton continued to direct Thor to bite Sligh on the rear of her upper leg and her ankle. Sligh alleges that "Sutton used the dog to purposively attack and bite" her; that "Montes did not intervene in the multiple dog bites by words or actions even though the attack lasted one minute and some seconds"; and that she never resisted seizure, tried to escape, or assaulted Montes.

Sligh's complaint is not the only account of what happened that night. Sligh's complaint also repeatedly references Sutton's bodycam footage (the "Video"), which was attached to Montgomery County and Montes's motion to dismiss. In the Video, Sutton encounters Sligh and shines a flashlight at her. Sligh begins to approach Sutton, who loudly says: "Wait, wait, wait, don't! Do not walk towards me! Do not walk towards me! The dog will bite

you!" Sligh acknowledges Sutton before shouting a profanity at the officers. Montes commands Sligh to place her hands behind her back. Sligh responds with more profanities and, contrary to the complaint's assertions that she never resisted, slaps at Montes's arms while attempting to pull away. Sligh and Montes physically struggle for about 11 seconds, at which point Sligh breaks free from Montes's grip. Sutton then releases Thor with a bite command, and Thor bites Sligh as Sutton commands her to get on the ground. Sligh falls to a seated position on the ground and cries out in pain. Beginning eight seconds after the bite command, Sutton repeatedly commands Thor to release Sligh, but Thor does not immediately comply. Sligh begins lying on her side. 36 seconds after giving the first bite command, Sutton grabs and pulls Thor's collar. Thor releases Sligh around 64 seconds following the first bite command.[1] While Thor was biting Sligh, Montes reaches to control Sligh's hands and commands her to put her hands behind her back. Montes handcuffs Sligh after Thor's release.

On April 21, 2020, Sligh filed a complaint against the City of Conroe and John Doe Conroe Police Officers alleging various constitutional, Americans with Disabilities Act ("ADA"), and Rehabilitation Act claims. Sligh subsequently amended her complaint three times and added the present Defendants-Appellees. In the operative third amended complaint filed on June 23, 2021, Sligh asserted various claims against Sutton and Montes in their individual capacities as well as claims against the City of Conroe and Montgomery County. Specifically, as relevant to this appeal, she asserted (1) a 42 U.S.C. § 1983 excessive force claim against Sutton; (2) a § 1983 failure-to-intervene/bystander liability claim against Montes; (3) a § 1983

---

[1] The time of the release is unclear from the footage. But given that Thor began and continued barking from this point, we can infer that the attack lasted 64 seconds at most from first bite to release.

municipal/*Monell* liability claim against the City of Conroe; and (4) various failure-to-accommodate claims under Title II of the ADA and § 504 of the Rehabilitation Act against both the City of Conroe and Montgomery County.

Montgomery County and Montes jointly moved to dismiss the complaint for failure to state a claim, raising, *inter alia*, a qualified immunity defense as to Montes. The City of Conroe and Sutton also moved to dismiss, with Sutton raising a qualified immunity defense. The district court granted all three motions. It held that (1) Sutton was entitled to qualified immunity on Sligh's excessive force claim; (2) Montes was entitled to qualified immunity on Sligh's failure-to-intervene/bystander liability claim; (3) Sligh had failed to state a § 1983 municipal liability claim against the City of Conroe; and that (4) Sligh's ADA and Rehabilitation Act claims against the City of Conroe and Montgomery County failed because they fell into the exigent circumstances exception to the ADA. Sligh timely appealed.

## II.

This court reviews *de novo* a district court's grant of a motion to dismiss. *Whitley v. BP, P.L.C.*, 838 F.3d 523, 526 (5th Cir. 2016). In considering a motion to dismiss, we may "also consider '[d]ocuments that a defendant attaches to a motion to dismiss . . . if they are referred to in the plaintiff's complaint and are central to her claim.'" *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016) (alteration in original) (quoting *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000)). If an allegation is qualified by the contents of an exhibit attached to the pleadings, but the exhibit instead contradicts the allegation, "the exhibit and not the allegation controls." *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 377 (5th Cir. 2004). Here, the Video was attached to Montgomery County and Montes's joint motion to dismiss and referenced

No. 22-40518

by Sligh in her operative complaint. Accordingly, to the extent that the Video contradicts Sligh's allegations, the Video controls.

## III.

### A. Excessive Force Claim

We begin with Sligh's excessive force claim against Officer Sutton. To overcome Sutton's qualified immunity defense, Sligh must show (1) that Sutton violated a constitutional right; and (2) that the right at issue was "clearly established" at the time of the alleged misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). We can address these inquiries in any order. *See id.* at 236.

To succeed on a Fourth Amendment excessive force claim, Sligh must demonstrate an "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *See Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)). "In excessive-force claims, the reasonableness of an officer's conduct depends on the 'facts and circumstances of each particular case . . . .'" *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Such a determination is based on "the perspective of a reasonable officer on the scene." *Id.* (quoting *Graham*, 490 U.S. at 396). The Supreme Court in *Graham v. Connor* outlined three factors that inform the reasonableness of an officer's use of force: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *See Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020) (citing *Graham*, 490 U.S. at 396).

The first *Graham* factor, the severity of the crime, weighs in Sligh's favor. The officers were called based on concerns about Sligh's mental health, not a crime she was suspected of committing.

The second *Graham* factor, whether the suspect posed an immediate threat to the safety of officers or others, also weighs in Sligh's favor. Sligh may have posed a safety threat to herself, as she had cut herself and was potentially suicidal, but the officers received no indication that Sligh was violent, armed, or otherwise posed a threat to others. Defendants-Appellees' contention that the employment of a dog bite was justified due to Sligh's immediate safety threat to *herself* is unpersuasive in this case. Sligh did not appear to be engaging in self-harm during her interactions with the officers, which undermines Defendants-Appellees' argument that Sligh posed an "immediate" safety threat to herself that warranted such a dangerous use of force. It is also difficult to see how Sligh's self-harm justifies the employment of a dog bite, which will inevitably lead to more punctures or lacerations.

Defendants-Appellees contend that Sutton could not determine whether Sligh had a weapon in her clothing, which weighs in favor of employing the dog bite. But it is difficult to imagine that Sutton would have believed that Sligh, who was wearing a tank top and women's athletic shorts, was armed when no weapon was produced during the physical struggle between Sligh and Montes. Furthermore, because the officers did not suspect that Sligh was violent or had committed a crime, the fact that she was unsearched is not enough to permit a reasonable officer to assume that she posed an immediate threat. *See Cooper*, 844 F.3d at 523 n.2.

The third *Graham* factor, whether the suspect was actively resisting arrest or attempting to evade arrest by flight, appears to weigh against Sligh. The Video shows that Sligh actively resisted seizure, did not follow verbal commands, and engaged in a physical struggle with Montes. Once Sligh

broke free from Montes's efforts to physically apprehend her, a reasonable officer could conclude that a heightened use of force would be necessary to detain her for her own safety. However, even where force is authorized, officers must employ an appropriate *degree* of force to stay within constitutional bounds. An officer must use force "with measured and ascending actions that correspond[] to [a suspect's] escalating verbal and physical resistance." *Joseph*, 981 F.3d at 332–33 (alterations in original) (quoting *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012)).

We find that under these circumstances, the decision to sic Thor on Sligh constituted an excessive use of force in violation of the Fourth Amendment. When Sligh slipped free from Montes's attempt to seize her, there was a break in the action. At that point, the officers could have attempted to escalate their use of physical force in a more measured manner, or they could have provided a clear warning that they would employ a dog bite if Sligh did not comply. Instead, Sutton sicced Thor on Sligh without warning.

Without any further attempts to subdue Sligh without the use of a dog bite, and without providing Sligh any warning that she may be subjected to a dog bite if she did not comply, Sutton sicced a dog on a woman who (1) was not suspected of any crime; (2) did not pose an immediate safety threat to officers or others; and (3) was in need of emergency medical intervention due to self-harm. Furthermore, Sligh—surrounded by a fence and thick foliage—was not attempting to flee the officers. Employing a dog bite under these circumstances arguably constituted an unreasonable seizure in violation of Sligh's Fourth Amendment rights.[2]

---

[2] We need not and do not address the issue of whether the prolonged duration of Thor's bite also constituted excessive force. Because Thor disobeyed Sutton's commands to release Sligh, the extension of the application of force in this case was arguably

No. 22-40518

Because we find that Sligh has alleged a violation of a constitutional right, we turn to the question of whether that right was clearly established at the time of the violation. "To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (internal quotation marks and citation omitted). Although this does not mean that "a case directly on point" is required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

"'[I]n an obvious case,' the *Graham* excessive-force factors themselves 'can clearly establish'" the law without a body of relevant precedent. *Cooper*, 844 F.3d at 524 (quoting *Newman v. Guedry*, 703 F.3d 757, 764 (5th Cir. 2012)). We find that the facts here do not present such an "obvious case." Because Sligh actively resisted seizure, the third *Graham* factor weighs against her and justified a use of heightened force. While the method of heightened force employed may have been unconstitutionally excessive, the *Graham* analysis in this case is not so obvious as to clearly establish the law without a body of relevant authority. Sligh therefore bears the burden of identifying precedent that clearly establishes her constitutional right.

---

unintentional. Sligh has offered no evidence that Thor, nor police dogs more generally, frequently ignore such commands to release. Neither has she offered any clearly established law indicating that an officer violates the Fourth Amendment when he or she loses control of a canine engaged in a dog bite. We therefore find that the unintended use of canine force that occurred after Sutton ordered Thor to release did not violate Sligh's clearly established right. Because we find that there was not a clearly established violation of a constitutional right, we need not address "whether in fact there is such a right." *See Pearson*, 555 U.S. at 236–37.

8

In arguing that Officer Sutton violated her clearly established right, Sligh relies primarily on the case *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016). In *Cooper*, the namesake plaintiff fled on foot after being pulled over on suspicion of driving under the influence ("DUI"). *Id.* at 521. An officer radioed for backup and explained that Cooper was a DUI suspect. *Id.* Defendant Officer Brown answered the call with his police dog, Sunny, who discovered Cooper in a small wood-fenced "cubbyhole." *Id.* The parties disputed whether Sunny initiated the attack or if Brown ordered it, but they agreed on the following sequence of events following the initial bite:

> Sunny continued biting Cooper for one to two minutes. During that time, Cooper did not attempt to flee or to strike Sunny. Brown instructed Cooper to show his hands and to submit to him. At the time of that order, Cooper's hands were on Sunny's head. Brown testified that he could see Cooper's hands and could appreciate that he had no weapon. Brown then ordered Cooper to roll onto his stomach. He complied, and Brown handcuffed him. But he did not order Sunny to release the bite until after he had finished handcuffing Cooper.

*Id.* This court affirmed the district court's denial of Brown's motion for summary judgment based on qualified immunity. *Id.* at 524–26. On the question of whether there was a constitutional violation, we held that all the *Graham* factors except for the severity of the crime "push[ed] heavily for Cooper." *Id.* at 522. Cooper did not pose an immediate threat because he was not suspected of committing a violent offense, Brown had not been warned that Cooper may be violent, and Brown could see that Cooper was unarmed. *Id.* at 522–23. Furthermore, Cooper was "not actively resisting arrest or attempting to flee or to strike Sunny." *Id.* at 523. The only act of resistance Brown identified was Cooper's understandable failure to raise his hands while being bit by Sunny. *Id.* And, in any case, Cooper complied with Brown's order to roll onto his stomach. *Id.* Also relevant to our analysis was

Brown's failure to immediately command Sunny to release the bite; instead, he waited until after Cooper had been handcuffed. *Id.* at 521, 523. In sum, while explicitly noting that we were not creating a per se rule on reasonableness, we concluded that "[u]nder the facts in this record, permitting a dog to continue biting a compliant and non-threatening arrestee is objectively unreasonable." *Id.* at 524.

The present case is distinguishable from *Cooper* in at least two material aspects. First, Sligh actively resisted seizure. *See id.* ("Our caselaw makes certain that once an arrestee *stops resisting*, the degree of force an officer can employ is reduced." (emphasis added)). Second, *Cooper* involved a dog bite that was intentionally prolonged. Sunny bit Cooper for one to two minutes before the officer finally ordered Sunny to release. *Id.* at 521. Here, Sutton repeatedly ordered Thor to release Sligh beginning about eight seconds after the initial bite command. And when Thor failed to obey his repeated commands, Sutton made affirmative efforts to release Thor by pulling his collar about 36 seconds following the first release command. Such conduct on Sutton's part suggests that the amount of force *intentionally* used here differs from *Cooper*, where the dog bit the plaintiff for one to two minutes and the officer did not order the dog to release the plaintiff until after the suspect was handcuffed. *See id.* at 524 (noting that "*permitting* a dog to continue biting a compliant and non-threatening arrestee is objectively unreasonable" (emphasis added)).

We find that *Cooper*'s precedent does not sufficiently "place[] the . . . constitutional question beyond debate." *See Ashcroft*, 563 U.S. at 741. *Cooper* involved a nonresisting plaintiff and an intentionally prolonged application of force. Because the present case involves an application of unintentionally prolonged force against an actively resisting plaintiff, we do not find that Sutton's violation of Sligh's constitutional right was clearly established. Sutton is therefore entitled to qualified immunity.

No. 22-40518

## B. Bystander Liability Claim

We next consider Sligh's failure-to-intervene/bystander liability claim against Montes. To overcome Montes's qualified immunity defense, Sligh must identify law clearly establishing that Montes's actions violated her constitutional rights, i.e., she must show that "any reasonable officer would have known that the Constitution required them to intervene." *Joseph*, 981 F.3d at 345. She has not done so. We accordingly need not and do not reach the question of whether Montes violated Sligh's constitutional rights. *See Pearson*, 555 U.S. at 236–37.

Sligh relies entirely on *Cooper* as clearly establishing the law relating to Montes's actions. But this reliance on *Cooper* is misplaced because *Cooper* is wholly inapplicable to a bystander liability theory. The facts and analysis in *Cooper* concerned only the conduct of the specific officer who controlled the dog. There was consequently no discussion in *Cooper* of whether another officer on site would be required to intervene as a bystander. Thus, *Cooper* cannot clearly establish that Montes—a bystander—violated Sligh's constitutional rights by failing to intervene. Sligh points to no other case clearly establishing the law on this issue. Accordingly, Montes is entitled to qualified immunity on Sligh's bystander liability claim.

## C. Municipal Liability Claim

We next consider Sligh's municipal liability claim against the City of Conroe. For such a claim, Sligh must identify "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *See Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

11

Sligh asserts three separate theories of municipal liability. First, Sligh argues that the City of Conroe had inadequate written policies concerning police dogs. Second, Sligh contends that the City of Conroe failed to adequately train Officer Sutton on the use of his police dog. Third, Sligh asserts that the City of Conroe ratified Sutton's actions by failing to punish him or change their policies. We address each theory of municipal liability in turn.

### 1. Inadequate Policies Claim

For an inadequate policies claim, "[a] plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right." *Peña v. City of Rio Grande City*, 879 F.3d 613, 621 (5th Cir. 2018) (quoting *Hicks-Fields v. Harris County*, 860 F.3d 803, 808 (5th Cir. 2017)). A plaintiff must also show that the policy was implemented with "deliberate indifference" to the "known or obvious consequences" that constitutional violations would result. *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 407 (1997)). Usually, a plaintiff must show "a pattern of similar violations" to establish deliberate indifference. *Valle*, 613 F.3d at 547. "To show deliberate indifference based on a single incident, there must be evidence that shows that it should have been apparent or obvious to the policymaker that a constitutional violation was the 'highly predictable consequence' of the particular policy." *Alvarez*, 904 F.3d at 391 (quoting *Burge v. St. Tammany Parish*, 336 F.3d 363, 373 (5th Cir. 2003)).

Sligh's policy-based claim fails because she has not adequately alleged that an official policy was a moving force behind Officer Sutton's violation of her constitutional right. Sligh alleges that "the only policy that the City has on the use of attack dogs is that they may be used on anyone: evading arrest;

known to be armed; that has demonstrated violence; that has the potential for violence; or has committed a felony." Sligh mischaracterizes the policy in question. Her quotations are misrepresentations of the relevant policy language, which states that police dogs can be "released off leash to apprehend any suspect evading arrest that is known to be armed, has demonstrated violence, or the potential for violence, or has committed a felony offense."

Sligh cannot establish a "moving force" causal relationship between this policy and Officer Sutton's constitutional violation. The policy limits the offensive employment of canines to a subset of suspects evading arrest, which does not apply to Sligh. Because Sutton was not following this policy when he sicced Thor on Sligh, we find that the policy cited by Sligh was not a moving force behind Sutton's constitutional violation.

Sligh also fails to adequately allege that the City's canine policies were deficient. She relies on *Chew v. Gates*, 27 F.3d 1432, 1445 (9th Cir. 1994), an out-of-circuit authority, to support her proposition that a *failure* to adopt a departmental policy governing the use of police dogs constitutes deliberate indifference. But in *Chew*, the court held that municipal liability could be found "[w]here the city equips its police officers with potentially dangerous animals, and evidence is adduced that those animals inflict injury in a significant percentage of the cases in which they are used," provided that the city "fail[s] to engage in any oversight whatsoever of an important departmental practice involving the use of force." *Id.*

Sligh's reference to the City's policy, which limits the offensive use of canines to apprehending a subset of suspects evading arrest, undermines her assertion that the City's canine policies were deficient. Additionally, unlike the plaintiff in *Chew*, Sligh fails to allege a widespread pattern of canine-related injury that would provide the City with "[a]ctual or

constructive knowledge" that its canine policies were constitutionally inadequate. *See Burge*, 336 F.3d at 370 (alteration in original) (quoting *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984)). She does not convincingly argue why she need not show a pattern of violations here, arguing only that this court should "infer" that such problems were "reoccurring." Sligh's speculation is insufficient to establish deliberate indifference as necessary for an inadequate policies claim.

Because the City's actual canine policy was not a "moving force" behind Officer Sutton's constitutional violation, and because Sligh has not alleged facts indicating that the City was deliberately indifferent to a known or obvious risk that its canine policies would result in constitutional violations, we find that the district court did not err in holding that Sligh failed to adequately allege an inadequate policies claim against the City of Conroe.

### 2. Failure-to-Train Claim

A failure-to-train theory of municipal liability requires Sligh to show that "1) the [city] failed to train or supervise the officers involved; 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *See Peña*, 879 F.3d at 623 (alteration in original) (quoting *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001)).

Sligh's failure-to-train claim fails because, as described above, she cannot show deliberate indifference on the City of Conroe's part. Sligh argues that the need for more or different training here is so obvious that the policymakers can reasonably be said to be deliberately indifferent. But she rests the entirety of her conclusory argument on the single present incident and pleads no pattern of prior incidents sufficient to place the City of Conroe

on "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *cf. id.* at 62 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." (quoting *Brown*, 520 U.S. at 409)). Because Sligh has failed to allege specific and non-conclusory facts that would show that the City was deliberately indifferent in adopting its training policy, we find that the district court did not err in dismissing Sligh's failure-to-train claim against the City of Conroe.

### 3. Ratification Claim

Concerning ratification, if "authorized policymakers approve a subordinate's decision and the basis for it, their ratification [is] chargeable to the municipality because their decision is final." *World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (5th Cir. 2009) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). "The theory of ratification, however, has been limited to 'extreme factual situations.'" *Id.* (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 848 (5th Cir. 2009)). "Therefore, unless the subordinate's actions are sufficiently extreme—for instance, an obvious violation of clearly established law—a policymaker's ratification or defense of his subordinate's actions is insufficient to establish an official policy or custom." *Id.*

Sligh's ratification theory fares no better than her other theories of municipal liability. Ratification is a limited theory of liability, and, for the reasons stated above, the present circumstances are neither an obvious violation of clearly established law nor an extreme factual circumstance sufficient to support a municipal liability claim. Thus, Sligh's ratification theory fails.

No. 22-40518

## D. ADA and Rehabilitation Act Claims

Finally, we consider Sligh's ADA and Rehabilitation Act claims against the municipalities.[3] "Title II of the ADA provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000) (quoting 42 U.S.C. § 12132). Although her briefing is not particularly clear, Sligh appears to be pursuing a failure-to-accommodate claim.[4]

"To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and its consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." *Ball v. LeBlanc*, 792 F.3d 584, 596 n.9 (5th Cir. 2015). "Plaintiffs ordinarily satisfy the knowledge element by showing that they identified their disabilities as well as the resulting limitations to a public entity or its employees and requested an accommodation in direct and specific terms." *Smith v. Harris County*, 956 F.3d 311, 317 (5th Cir. 2020). "When a plaintiff fails to request an

---

[3] We adjudicate and refer to the ADA and Rehabilitation Act claims collectively as the "ADA claims" below. *See D.A. ex rel. Latasha A. v. Hous. Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010) ("Because this court has equated liability standards under § 504 [of the Rehabilitation Act] and the ADA, we evaluate [Plaintiff's] claims under the statutes together.").

[4] Specifically, Sligh argues that the municipal Defendants-Appellees failed to accommodate her mental disabilities by (1) using a police attack dog; (2) not educating and training officers in caring for mentally disabled persons; (3) not using verbal de-escalation techniques; (4) not protecting Sligh from further harm; (5) not allowing Sligh an opportunity to account for her being surrounded; (6) not adopting a policy to protect the mentally disabled; (7) not conducting self-evaluation plans under the ADA or Rehabilitation Act; and (8) not modifying their programs and services to accommodate the mentally disabled.

accommodation in this manner, he can prevail only by showing that 'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents." *Id.* at 317–18 (quoting *Windham v. Harris County*, 875 F.3d 229, 237 (5th Cir. 2017)).

Sligh does not meet this standard. Assuming *arguendo* that she is a qualified individual with a disability under the ADA, Sligh pleads no facts showing that she requested an accommodation or that her disability and limitations were known by the covered entity. At this stage, we must take as true her allegations that "Officer Sutton and Deputy Montes learned that Olivia had cut herself, was suicidal, [and] that she was a mental health patient." But Sligh does not allege that she identified her disabilities or resulting limitations; nor does she allege that she requested any of her accommodations "in direct and specific terms" to the officers. *See id.* at 317. The Video further corroborates that she did not request the accommodations that she now alleges were denied.

Having failed to make such requests, Sligh can "prevail only by showing that 'the disability, resulting limitation, and necessary reasonable accommodation' were 'open, obvious, and apparent' to the entity's relevant agents." *See id.* at 317–18 (quoting *Windham*, 875 F.3d at 237). But she does not attempt to make this showing. Nor could she. Neither her limitations nor her highly specific desired accommodations were open, obvious, and apparent under the given facts, where a police dog was used to track a missing person who then immediately began physically struggling with one of the officers. Because Sligh has not shown that her disability and limitations were known by the municipalities, her failure-to-accommodate claims under the

17

No. 22-40518

ADA and Rehabilitation Act are inadequate and were appropriately dismissed.[5]

## IV.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[5] Because we can "affirm on any ground supported by the record, including one not reached by the district court," we do not and need not consider the district court's invocation of the exigency exception to the ADA. *See Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 781 (5th Cir. 2012).